**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRADLEY JAMES CARLSON, | ) | Case No. 4:24-bk-40261-CAN |
| | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| ENTERPRISE BANK AND TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| BRADLEY JAMES CARLSON, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT</u>**

Enterprise Bank and Trust ("**Enterprise**"), a creditor and party-in-interest in the above-captioned bankruptcy case, alleges for its Complaint against Bradley James Carlson ("**Debtor**") as follows:

**<u>INTRODUCTION</u>**

1. On February 29, 2024 (the "**Petition Date**"), Debtor filed his Voluntary Petition under Chapter 7 of Title 11 of the United States Code [ECF 1].

2. Enterprise's current deadline to file an objection to discharge and/or dischargeability of debts under Sections 523 and 727 is July 31, 2025. The deadline has not passed.

1

3.      This adversary proceeding arises in and is related to the Chapter 7 case. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157(a) and (b)(1), 28 U.S.C. § 1334(b), and 11 U.S.C. § 523.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

5.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157.

## PARTIES

6.      Plaintiff Enterprise is a Missouri Trust Company with its main office in the state of Missouri.

7.      Debtor is an individual resident of Missouri located at 1722 Madison Avenue, Kansas City, MO 64108.

## FACTUAL ALLEGATIONS

### I.   The Enterprise Loan Documents.

8.      Enterprise made multiple loans to entities owned and managed by Debtor including Mulungas II, LLC f/k/a Force Commercial Building, LLC ("**Mulungas II**"), Mulungas I, LLC f/k/a Mulungas, LLC ("**Mulungas I**"), Empirical Prime, LLC f/k/a Force Midwest, LLC ("**Empirical**"), Apex Specialty Vehicles, LLC ("**Apex**"), MAG Trucks, LLC ("**Mag**"), and EP Manufacturing, LLC f/k/a Mid Western Automotive, LLC ("**EP**," are collectively with Mulungas II, Mulungas I, Empirical, Apex, Mag, and EP, the "**Borrowers**," and each individually are a "**Borrower**").

9.      In connection with these loans, Borrowers executed a Business Loan Agreement, dated December 2, 2019, by and among Mulungas I, Mulungas II, Empirical, Apex, Mag, EP and Enterprise (the "**Original Loan Agreement**"). The Original Loan Agreement is attached as Exhibit A.

10.      The Original Loan Agreement was amended pursuant to a First Amendment to Business Loan Agreement, dated February 11, 2020, a Second Amendment to Business Loan Agreement, dated August 31, 2020, and a Third Amendment to Business Loan Agreement, dated November 30, 2020 (collectively, the "**Loan Agreement Amendments**," and together with the Original Loan Agreement, the "**Loan Agreement**"). The Loan Agreement Amendments are attached as Exhibit B.

11.      In connection with the Loan Agreement, Mulungas II executed a Promissory Note, dated April 30, 2019, in the original principal amount of $768,000.00 in favor of Enterprise (as modified, amended and/or restated from time to time, the "**First Note**"). The First Note is attached as Exhibit C.

12.      Borrowers Mulungas I, Mulungas II, Apex, Mag, EP, and Empirical, LLC also executed a Promissory Note, dated December 2, 2019, in the original principal amount of $1,000,000.00 in favor of Enterprise, which was subsequently amended pursuant to a First Amendment to Promissory Note, dated November 30, 2020, a Second Amendment to Promissory Note, dated November 29, 2021, and a Third Amendment to Promissory Note, dated May 28, 2022 (collectively, the "**Second Note**"). The Second Note, with its amendments, is attached as Exhibit D.

13.      Borrowers Mulungas I, Mulungas II, Apex, Mag, EP, and Empirical executed a Promissory Note, dated December 2, 2019, in the original principal amount of $2,000,000.00 in favor of Enterprise, which was subsequently amended pursuant to a First Amendment to Promissory Note, dated February 11, 2020, a Second Amendment to Promissory Note, dated November 30, 2020, and a Third Amendment to Promissory Note, dated November 29, 2021, and

a Fourth Amendment to Promissory Note, dated May 28, 2022 (collectively, the "**Third Note**").

The Third Note, with its amendments, is attached as Exhibit E.

14.     Borrowers Mulungas I, Mulungas II, Apex, Mag, EP, and Empirical executed a Promissory Note, dated December 2, 2019, in the original principal amount of $2,832,000.00 in favor of Enterprise (the "**Fourth Note**," and collectively with the First Note, Second Note, and Third Note, the "**Notes**"). The Fourth Note is attached as Exhibit F.

15.     Collectively, the amounts advanced to Borrowers under the Notes are the "**Loans.**"

16.     The Notes are secured by various documents and instruments, including: (i) a Security Agreement, dated December 2, 2019, between Mulungas I and Enterprise; (ii) a Security Agreement, dated December 2, 2019, between Mulungas II and Enterprise; (iii) a Security Agreement, dated December 2, 2019, between Empirical and Enterprise; (iv) a Security Agreement, dated December 2, 2019, by and between Apex and Enterprise; (v) a Security Agreement, dated December 2, 2019, by and between Mag and Enterprise; and (vi) a Security Agreement, dated December 2, 2019, by and between EP and Enterprise (collectively, the "**Enterprise Security Agreements**"). The Enterprise Security Agreements are attached as Exhibit G.

17.     The Enterprise Security Agreements granted Enterprise a first lien on all Borrowers' assets including, among other things, vehicles held for sale or lease, other inventory, raw materials, goods, accounts, deposit accounts, instruments, general intangibles, and chattel paper (collectively with all other collateral described in the Enterprise Security Agreements, the "**Collateral**"). Liens on the Collateral granted as security under the Enterprise Security Agreement were perfected by the filing of UCC financing statements.

18. Debtor guarantied repayment of the amounts lent to Borrowers pursuant to the Notes by virtue of:

   a. a Commercial Guaranty dated December 20, 2013, attached as Exhibit H, whereby Debtor guarantied the amounts owed by Mulungas, LLC (now known as Mulungas I) to Enterprise (the "**Mulungas I Guaranty**");

   b. A Commercial Guaranty dated July 10, 2014, attached as Exhibit I, whereby Debtor guarantied the amounts owed by Mulungas, LLC (now known as Mulungas I) to Enterprise (the "**Second Mulungas I Guaranty**");

   c. A Commercial Guaranty dated June 23, 2015, attached as Exhibit J, whereby Debtor guarantied the amounts owed by Mulungas, LLC (now known as Mulungas I) to Enterprise (the "**Third Mulungas I Guaranty**");

   d. a Commercial Guaranty dated April 30, 2019, attached as Exhibit K, whereby Debtor guarantied the amounts owed by Force Commercial Building, LLC (now known as Mulungas II) to Enterprise (the "**Mulungas II Guaranty**");

   e. a Guaranty Agreement dated December 2, 2019, attached as Exhibit L, whereby Debtor guarantied the amounts owed by Empirical, Apex, MAG, Mid Western Automotive, LLC (now known as EP), and Force Commercial Building, LLC to Enterprise (the "**Omnibus Guaranty**").

19. Collectively, the Mulungas I Guaranty; Second Mulungas I Guaranty, Third Mulungas I Guaranty, Mulungas II Guaranty, and Omnibus Guaranty are the "**Guaranties**," and the Loan Agreement, Notes, Enterprise Security Agreements, Guaranties and all other documents and agreements relating to the Loans are collectively the "**Loan Documents**."

20.     Pursuant to the Guaranties, Debtor agreed that upon Borrowers' default, he would pay the full amounts owed under the Notes. Exhibit H at p. 1; Exhibit K at p. 1; Exhibit L at ¶ 1.

21.     Additionally, Debtor agreed to not take any action which might reasonably be expected to have a material effect on Debtor's financial condition such that Debtor would be unable to perform his obligations under the Guaranty. Exhibit L at ¶ 4(i).

## II.     Debtor Solicits New Financing from Central Bank.

22.     Under the Loan Documents, Borrowers agreed that they would not incur any additional indebtedness or borrow any money without the prior consent of Enterprise, unless it was incurred to trade creditors in the ordinary course of their businesses. Exhibit A at § 8(o).

23.     The creation of any lien, security interest, or encumbrance against the Collateral constituted a default under the Loan Agreement, unless otherwise approved by Enterprise. Exhibit A at § 11(i).

24.     Approximately one year after entering into the Loan Agreement with Enterprise, and despite the representations made by Borrowers in the Loan Agreement and other Loan Documents, Debtor approached Central Bank ("**Central**") to obtain additional financing for Borrowers.

25.     Central began making loans to Mag beginning in January of 2021 through approximately December of 2022. Collectively, the loans advanced by Central to Borrowers are the "**Central Bank Loans**."

26.     Through the Central Bank Loans, Central provided financing for vehicles, floor plan inventory, and real estate.

27.     As security for the repayment of the Central Bank Loans, Central obtained a security interest in Mag's inventory and a blanket lien on all Borrowers' other assets.

28.     The collateral pledged for the repayment of the Central Bank Loans also constituted Enterprise's Collateral.

29.     Debtor also guarantied repayment of the amounts owed to Central pursuant to a Guaranty dated January 19, 2021 (the "**Central Bank Guaranty**"). The Central Guaranty is attached as Exhibit M.

**III.    Debtor Solicits Additional New Financing from Pinnacle Bank.**

30.     Additionally, as early as December of 2021, Debtor solicited additional financing from other lenders, including but not limited to Pinnacle Bank, N.A. ("**Pinnacle**").

31.     Debtor caused Borrowers to enter into other loans with Pinnacle (collectively, the "**Pinnacle Bank Loans**") in violation of the Loan Documents including:

   a.  Business Loan Agreement dated December 30, 2021 executed by Mag;

   b.  Business Loan Agreement dated December 31, 2021 executed by Mag;

   c.  Business Loan Agreement dated March 25, 2022 executed by Mag;

   d.  Business Loan Agreement dated April 5, 2022 executed by Apex;

   e.  Business Loan Agreement dated September 16, 2022 executed by Apex;

   f.  Business Loan Agreement dated December 14, 2022 executed by Mag;

   g.  Business Loan Agreement dated February 27, 2023 executed by Mag (collectively, the "**Pinnacle BLAs**").

The Pinnacle BLAs are attached as Exhibit N.

32.     The amounts advanced to Mag and Apex under the Pinnacle BLAs are evidenced by, among other things, the following promissory notes executed by Debtor on behalf of Borrowers:

   a.  Promissory Note executed by Mag dated December 30, 2021 in the original principal amount of $350,256.00;

b. Promissory Note executed by Mag dated December 31, 2021 in the original principal amount of $110,256.00;

c. Promissory Note executed by Mag dated March 25, 2022 in the original principal amount of $2,000,000.00;

d. Promissory Note executed by Apex dated April, 5, 2022 in the original principal amount of $46,219.00;

e. Promissory Note executed by Apex dated April 5, 2022 in the original principal amount of $38,093.00;

f. Promissory Note executed by Apex dated April 5, 2022 in the original principal amount of $19,585.00;

g. Promissory Note executed by Apex dated April 5, 2022 in the original principal amount of $10,375.46;

h. Promissory Note executed by Apex dated September 16, 2022 in the original principal amount of $116,246.23;

i. Promissory Note executed by Mag dated December 14, 2022 in the original principal amount of $76,256.00;

j. Promissory Note executed by Mag dated February 27, 2023 in the original principal amount $79,771.10 (collectively, the "**Pinnacle Notes**");

The Pinnacle Notes are attached as Exhibit O.

33. To secure repayment of the Pinnacle Notes, Debtor caused Apex and Mag to pledge certain collateral to Pinnacle pursuant to certain security agreements including the following:

a. Commercial Security Agreement dated March 25, 2022 executed by Mag pledging all its vehicle inventory as security;

b. Commercial Security Agreement dated April 5, 2022 executed by Apex pledging certain of its equipment as security;

c. Commercial Security Agreement dated April 5, 2022 executed by Apex pledging all its inventory, chattel paper, accounts, equipment and general intangibles as security;

d. Commercial Security Agreement dated April 5, 2022 executed by Apex pledging certain of its equipment as security;

8

e. Commercial Security Agreement dated April 5, 2022 executed by Apex pledging certain of its additional equipment as security;

f. Commercial Security Agreement dated December 14, 2022 executed by Mag pledging a vehicle as security;

g. Commercial Security Agreement dated September 16, 2022 executed by Apex pledging certain of its additional equipment as security;

h. Commercial Security Agreement dated February 27, 2023 executed by Mag pledging a vehicle as security (collectively, the ("**Pinnacle Security Agreements**")).

The Pinnacle Security Agreements are attached as <u>Exhibit P</u>.

34. The Pinnacle Security Agreements purported to pledge, among other things, Apex's and Mag's inventory, equipment, accounts, and general intangibles (the "**Pinnacle Collateral**").

35. The Pinnacle Collateral was already pledged as security for repayment of the amounts advanced by Enterprise pursuant to the Enterprise Security Agreements.

36. Each of the Pinnacle Security Agreements cross-collateralized all obligations and liabilities of Mag and Apex to Pinnacle, so that all Pinnacle Collateral listed in each Pinnacle Security Agreements secured all amounts owed by Apex and Mag to Pinnacle.

37. Debtor also agreed to personally guaranty the debts owed to Pinnacle pursuant to an unlimited guaranty dated on or around December 30, 2021.

38. Under Section 7(b) of the Loan Agreement, Borrowers represented and warranted that the Collateral would be free and clear of all liens, except for the liens created by the Loan Documents or the liens agreed to by Enterprise in writing. *See* Exhibit A at § 7(b).

39. Neither Debtor nor anyone else associated with Borrowers informed Enterprise that Borrowers were seeking new financing from Pinnacle, or that they would be granting liens on Enterprise's Collateral to secure repayment of this new financing.

40. Enterprise discovered that Debtor caused Borrowers to enter into the Pinnacle Bank Loans, and pledged a security interest in the Pinnacle Collateral, when Debtor submitted a borrowing base certificate in the summer of 2023 which, for the first time, identified certain assets as "Pinnacle Collateral."

41. Enterprise would not have advanced the Loans to Borrowers had it known that Debtor would cause Borrowers to solicit additional financing from Pinnacle and that Debtor would cause Borrowers to grant additional liens on Enterprise's Collateral.

42. Enterprise was harmed by Debtor causing Borrowers to violate their obligations under the Loan Documents in that Borrowers made certain payments to Pinnacle for the sale of Collateral that should have been paid to Enterprise, given its first lien on the property that constituted both Collateral and Pinnacle Collateral.

43. Pinnacle initially refused to turn these sums over to Enterprise. Enterprise was ultimately required to retain counsel and engage in extensive discussions with Pinnacle before the matter was ultimately resolved.

## IV. Borrowers' and Debtor's Financial Reporting.

44. In connection with Borrowers and Debtor's solicitation of the Loans, and in connection with their requests to draw on lines of credit offered pursuant to the Notes (the "**Revolving Lines of Credit**"), Debtor provided Enterprise with certain financial reports for both himself and Borrowers.

45. Under the Loan Agreement, Borrowers agreed not to accept any advance on the Loans without representing and warranting, among other things, that the representations and warranties in the Loan Agreement were true and correct as of the date of each advance, that no event of default had occurred or was continuing, that no lien on the Collateral was created, had

10

arisen, or otherwise existed, and there was no default under the terms of the Enterprise Security Agreements. Exhibit A at § 5(a), (c)-(d).

46.     Under Section 6(q) of the Loan Agreement, Borrowers represented and warranted that no financial statement of any Borrower, or any other financial information that was or would be provided to Enterprise, would contain untrue statements of material facts or omit a material fact necessary to make the statement no misleading. *Id.* at § 6(q).

47.     Borrowers additionally agreed that all reports provided to Enterprise would be accurate, correct, and complete.

48.     Section 6(q) of the Loan Agreement further provides that Borrowers represented and warranted to Enterprise that there was no material adverse change to Borrowers' or Debtor's financial condition since the date of their most recent financial statements.

49.     In connection with the Guaranties, Debtor represented and warranted, among other things, that the financial statements and statements of financial condition delivered to Enterprise would be true and accurate. Exhibit H at p. 1; Exhibit K at p. 2.

50.     Debtor additionally agreed to provide personal financial statements and schedules of debt within ninety days after the end of each calendar year, and to certify that those financial statements and schedules were true and accurate. Exhibit L at ¶ 19.

51.     Despite these representations, Debtor made numerous misrepresentations to Enterprise with respect to his financial condition and the financial condition of Borrowers to induce Enterprise to further advance sums under the Revolving Lines of Credit and to prevent Enterprise from calling defaults on the Loans.

52.     Specifically, Debtor provided Enterprise information concerning his purported financial condition, along with the condition of Borrowers, as of December 31, 2021 as required

by the Loan Documents through a spreadsheet dated February 9, 2022 (the "**2021 Financial Report**"). The 2021 Financial Report is attached as Exhibit Q.

53.     The 2021 Financial Report purports to show the combined balance sheet of Debtor, along with Borrowers and their related entities, as of December 31, 2021 and a combined profit and loss statement from January through December of 2021.

54.     The 2021 Financial Report states that Debtor had $0.00 in "Total Current Liabilities" as of December 31, 2021. Exhibit Q at p. 1.

55.     Debtor knew that the 2021 Financial Report was inaccurate because, among other things, his 2020 tax return (the "**Debtor 2020 Tax Return**") was submitted by his accountant, CBIZ MHM, LLC on or around October 5, 2021, which demonstrates that Debtor owed approximately $147,168 in unpaid taxes and owed penalties of approximately $2,258.

56.     Debtor owed these amounts to the Internal Revenue Service because, despite purportedly generating significant income in tax year 2020, Debtor made no estimated tax payments or any other payments on his 2020 federal tax liability.

57.     The only amounts applied to Debtor's 2020 federal tax liability came from the application of $2,577 from Debtor's overpayment in a prior year.

58.     Debtor's 2020 federal tax liability was not paid as of the date the 2021 Financial Report was generated or the date this report was provided to Enterprise.

59.     Indeed, Debtor's 2020 federal tax liability was still outstanding in 2022. Debtor's schedules show that Empirical made two payments of $25,000 on February 2, 2022 and March 28, 2022 on Debtor's outstanding 2020 federal taxes. [ECF 1 at pp. 54-55].

60.     Despite the fact that these amounts remained unpaid, the 2021 Financial Report did not list the amounts Debtor owed to the Internal Revenue Service for his 2020 income taxes.

61.    Given Debtor's purported adjusted gross income in 2020, and the fact that he made no additional tax payments, Debtor knew that he would owe significant taxes which would bear on his ability to repay the amounts advanced pursuant to the Notes.

62.    Despite this, Debtor did not disclose to Enterprise this change in his financial condition or disclose these tax liabilities in any financial reporting provided to Enterprise.

63.    Enterprise would not have entered into the amendments to the Loan Documents in 2020 and 2021, or allowed Borrowers to obtain additional advances on Revolving Lines of Credit, if it knew about Debtor's significant tax liabilities.

64.    Further, Debtor provided Pinnacle a Combined Financial Statements for Empirical Prime, LLC & Affiliates for the years ended December 31, 2021 and 2020 dated August 2, 2022 (the "**Pinnacle Financial Report**") prepared by Borrowers' and Debtor's accountants, Mayer Hoffman McCann P.C. The Pinnacle Financial Report is attached as Exhibit R.

65.    The Pinnacle Financial Report contains a line item for "Receivable From Owner" that does not appear in the 2021 Financial Report provided to Enterprise. *See* Exhibit R at pp. 2, 4-5, 7, and 17.

66.    The Pinnacle Financial Report provides a summary of this "Receivable From Owner" line item which states:

> "During 2021 the Companies held a receivable from owner that is collateralized by real property and bears interest at 4%. The balance will be due on December 31, 2031. Based on the nature of the advance and circumstances giving rise to the transaction, the advance has been classified as a reduction to owner's equity."

*Id.* at 7.

67.    While both the 2021 Financial Report and the Pinnacle Financial Report purport to provide a Combined Balance Sheet for Debtor and his businesses as of December 31, 2021, the

13

2021 Financial Report provided to Enterprise generally represents that Borrowers had greater assets and fewer liabilities then the Pinnacle Financial Report.

68. For example, the 2021 Financial Report represents that Apex had assets of $7,137,891 as of December 31, 2021, while the Pinnacle Financial Report provides that Apex's assets totaled $4,210,625.00 as of the same date. *Compare* Exhibit Q at p. 1 *with* Exhibit R at p 17.

69. Apex's liabilities, after including the purported "Receivable from Owner" omitted from the 2021 Financial Report, totaled $4,727,343 in the Pinnacle Financial Report while the 2021 Financial Report stated that Apex only had $3,145,109.59 in liabilities. *Compare* Exhibit Q at p. 1 *with* Exhibit R at p 17.

70. As a whole, the Pinnacle Financial Report demonstrates that the 2021 Financial Report provided to Enterprise misrepresented the financial condition of Borrowers by listing inflated assets and reduced liabilities.

71. The omission of the alleged "Receivable From Owner" line item from the 2021 Financial Report demonstrates that Debtor sought to conceal debts that Borrowers purportedly owed to Debtor from Enterprise.

72. Debtor made each of these false representations to induce Enterprise to continue to allow Borrowers to draw on the Revolving Lines of Credit, to induce Enterprise to agree to the modifications to the Loan Documents entered into in 2022, and to cause Enterprise to further expand the credit available to Borrowers under the Loan Documents.

**V.     Borrowers' Inaccurate Borrowing Base Certificates.**

14

73. Debtor and Borrowers also provided incorrect financial reporting to induce Enterprise to allow them to draw greater sums under the Revolving Lines of Credit then allowed under the Loan Documents.

74. Enterprise agreed to make advances on the Revolving Lines of Credit to Apex from time to time up to the maximum amount specified or equal to an amount calculated based on the sum of 80% of certain of the accounts held by Apex and 50% of the "Apex Eligible Inventory" (the "**Apex Borrowing Base**"). Exhibit A at p. 2.

75. "Apex Eligible Inventory" was defined to mean all of Apex's inventory except for inventory not owned by Apex free and clear of liens, inventory that was obsolete, unsaleable, damaged, defective, or unfit for processing, and work in progress. Exhibit A at p. 3.

76. Enterprise also agreed to make advances on the Revolving Lines of Credit to Mag from time to time up to the maximum amount specified or equal to the sum of 100% of "MAG Eligible Box Truck and Step Van Inventory"; and the lesser of 100% of "MAG Eligible Kanban Inventory" or $1,000,000.00 (the "**Mag Borrowing Base**").

77. "MAG Eligible Box Truck and Step Van Inventory" was defined to mean the entire inventory of ready and available for sale box trucks and independent service provider step vans, excluding food trucks and custom conversion trucks or vans. Exhibit A at p. 10.

78. "MAG Eligible Kanban Inventory" was defined to mean the entire inventory of ready and available for sale food trucks and custom conversion trucks or vans. Exhibit A at p. 10.

79. To determine the amounts of the Apex Borrowing Base and Mag Borrowing Base, Borrowers were required to submit a borrowing base certificate, which would provide Enterprise information concerning the relevant accounts and inventory and provide a calculation of the Apex Borrowing Base and Mag Borrowing Base (the "**Borrowing Base Certificates**").

80. Sections 7(d) of the Loan Agreement additionally provide that all inventory represented by Borrowers to be "Eligible Inventory" under the Loan Agreement would conform with the definition of "Eligible Inventory."

81. To be considered "Eligible Inventory" under the Loan Agreement, such inventory had to be, among other things, free and clear of any liens or security interests. *Id.* at p. 3.

82. From and after the Central Bank Loans and Pinnacle Bank Loans, Debtor caused Borrowers to continue to provide Borrowing Base Certificates so Borrowers could draw on the Revolving Lines of Credit.

83. However, each of Borrowers' Borrowing Base Certificates were inaccurate and misleading because they included inventory pledged to Central and Pinnacle as collateral and were therefore not "Eligible Inventory" as defined in the Loan Documents.

84. Further, the Borrowing Base Certificates provided by Borrowers were inaccurate because they list $0 for the "Current Borrowings Outstanding," despite the fact that both the Revolving Lines of Credit had balances.

85. Enterprise was damaged by these misrepresentations because Borrowers would not have been permitted to draw on the Revolving Lines of Credit if Enterprise knew that Borrowers' disclosures were inaccurate.

## VI. Debtor Provides Additional Inaccurate Information in Connection with Forbearance Discussions.

86. Before Enterprise learned of the defaults and misrepresentations identified above, Borrowers executed a Forbearance Agreement dated March 30, 2023 ("**Forbearance Agreement**"), in which Borrowers acknowledged defaults under the Loan Documents pursuant to the maturity of the Notes and Enterprise agreed to forbear on Borrowers' defaults until, May 31, 2023. The Forbearance Agreement is attached as Exhibit S.

87.     After entering into the Forbearance Agreement, Enterprise became aware of the Pinnacle Bank Loans and the associated defaults under the Loan Documents.

88.     As a result of these defaults, Enterprise contacted Debtor to discuss entering into another forbearance agreement and requested that Debtor provide it updated financial reporting information for himself and Borrowers in furtherance of these forbearance discussions.

89.     In connection with this request, Borrowers' counsel sent Debtor's financial statements to Enterprise's counsel by email on August 21, 2023.

90.     Debtor ultimately determined not to proceed with this forbearance and the discussions terminated.

91.     However, following the termination of the forbearance discussions, Enterprise discovered inconsistencies in the financial reporting information provided by Debtor.

92.     Specifically, in connection with the requested forbearance, Debtor's counsel provided Enterprise a Personal Financial Statement Form dated August 16, 2023, signed by Debtor along with an acknowledgement that false statements and overvalues of any property could be subject to criminal penalties under 18 U.S.C. § 1014 (the "**2023 Personal Financial Statement**").

93.     The 2023 Personal Financial Statement also included a printed spreadsheet named "BC Personal Asset Schedule." The tab labeled "BC Personal Asset Schedule" from the 2023 Personal Financial Statement is attached as Exhibit T.

94.     This email also contained a native excel spreadsheet named "copy of 2023 EXPANDED BALANCE SHEET" (the "**2023 Expanded Balance Sheet**").

95.     The 2023 Expanded Balance Sheet contained a tab labeled "BC Personal Asset Schedule," also dated August 16, 2023. The tab labeled "BC Personal Asset Schedule" from the 2023 Expanded Balance Sheet is attached as Exhibit U.

96.    However, Enterprise discovered that despite both sheets bearing the same date, the "BC Personal Asset Schedule" provided in connection with Enterprise's Personal Financial Statement lists higher values for certain of Debtor's assets.

97.    For example, in the 2023 Expanded Balance Sheet, Debtor stated his watches were valued at $24,194, while the Personal Financial Statement lists the value of these watches at $58,000.

98.    Debtor also listed a higher value for his personal firearms in the Personal Financial Statement than what was provided in the 2023 Expanded Balance Sheet.

99.    Debtor also failed to disclose the amounts that he owed to the Internal Revenue Service on his Personal Financial Statement.

**VII.    Enterprise Enforces its Remedies and Obtains the Appointment of a Receiver over Borrowers.**

100.    After forbearance talks between Enterprise, Borrowers and Debtor failed, and given that the amounts owed under the Loan Documents had matured, Enterprise proceeded to file suit against Borrowers and Debtor.

101.    On October 24, 2023, Enterprise filed its Verified Petition for Appointment of a Receiver and Other Relief in the matter styled *Enterprise Bank & Trust v. Mulungas II, LLC, et al.*, case number 2316-CV28464 in the Circuit Court of Jackson County, Missouri (the "**Receivership Action**").

102.    On the same day, Enterprise filed its Motion for Appointment of Receiver (the "**Receiver Motion**") seeking, among other things, the appointment of a general receiver over the Collateral and sought expedited consideration of the Receiver Motion.

18

103.    On October 25, 2023, Enterprise filed its Petition in the matter styled *Enterprise Bank & Trust v. Bradley J. Carlson, et al.*, case number 2316-CV28588 in the Circuit Court of Jackson County, Missouri seeking to collect on the Guaranties (the "**Guarantor Action**").

104.    On November 1, 2023, Borrowers submitted their *Objection to the Emergency Motion to Expedite Appointment of Receiver* alleging that they required additional time to respond to the Receiver Motion.

105.    On November 3, 2023, the court in the Receivership Action entered its *Limited Order for Appointment of Receiver* (the "**Temporary Receiver Order**") and appointed Erik White with Harney Partners as the temporary receiver.

106.    On November 13, 2023, Borrowers submitted their *Objection to Motion to Appoint Receiver* and alleged, among other things, that Debtor stopped operating Borrowers' business when Enterprise first indicated its intent to file the Receivership Action.

107.    Enterprise and Borrowers subsequently negotiated the terms of an agreed receiver order and on November 17, 2023, the court in the Receivership Action entered its *Stipulated Order Appointing Receiver* which, among other things, set aside the Temporary Receiver Order and appointed Brent King with Glass Ratner Advisory and Capital Group ("**Receiver**") as the general receiver over Borrowers' assets.

108.    On January 19, 2024, Receiver filed his Receiver's Report No. 1 (the "**First Receiver Report**") and noted, among other things, that:

a.  Receiver was in possession of a computer server with Borrowers' financial information, but that some documents and information seemed to have been removed from the server;

b.  Receiver believes that Borrowers have been insolvent since 2019 and that it was only the receipt of Paycheck Protection Program loans and loans under the CARES Act that kept the businesses functioning;

19

c.  Receiver believed that financial statements provided by Apex and Mag did not accurately reflect their financial condition because they omitted debts and obligations and overstated profits;

d.  Receiver believed that Mag and Apex took funds out of Borrowers in excess of $2 million dollars for luxury vehicles and boats and provided other perks to executives;

e.  Receiver believed that Debtor, along with Borrowers' former executives Christine Brandow ("**Brandow**") and Emilie Thill ("**Thill**"), created new entities on the eve of the Receiver's appointment listing Brandow and Thill as officers of those entities on formation documents to conceal Debtor's involvement in these entities.

The First Receiver Report is attached as Exhibit V.

109.    Together, the Receiver's investigation indicates that Debtor, through Borrowers, sought to delay Enterprise from obtaining the appointment of a Receiver in the Receivership Action so he could create new entities and transfer assets of Borrowers to those new entities before Receiver had the opportunity to take control of the entities.

110.    Receiver is currently in the process of liquidating Borrowers' assets and distributing the proceeds to creditors.

### COUNT I - OBTAINING AN EXTENSION OF CREDIT THROUGH THE USE OF A FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B) BY REPRESENTING TO ENTERPRISE THAT BORROWERS WERE SOLVENT AT THE ORIGINATION OF THE LOANS

111.    Enterprise incorporates its allegations above as if fully set forth below.

112.    Debtor made a written statement concerning his and Borrowers' financial condition by causing Borrowers to represent to Enterprise that, among other things, they were not insolvent as of the date of the Original Loan Agreement. Exhibit A at § 6(j).

113.    Despite this representation, and upon information and belief based on the Receiver's analysis of Borrowers' financial condition, Borrowers were insolvent beginning at or near the time of the Original Loan Agreement.

114.    Debtor knew at the time of the Original Loan Agreement, and each extension of credit following the execution of the Original Loan Agreement, that Borrowers were insolvent but continued to solicit the Loans and draws on the Revolving Lines of Credit despite this knowledge.

115.    In making these misrepresentations, Debtor intended to deceive Enterprise as to Borrowers' financial condition to induce it to provide the Loans and allow draws on the Revolving Lines of Credit.

116.    Enterprise relied on Borrowers' false representations of their solvency and was misled because it would not have advanced the Loans to Borrowers or allowed draws on the Revolving Lines of Credit if it knew of Borrowers' true financial condition.

117.    Enterprise's reliance on Borrowers' representations of their solvency was reasonable because, among other things, Borrowers and Debtor represented and warranted to Enterprise that the financial reporting provided was true and accurate.

118.    Enterprise was wrongfully induced into extending money to Borrowers and was damaged by these misrepresentations because it would not have provided the Loans to Borrowers if it knew that Borrowers were insolvent at the time of the Original Loan agreement, and for each extension of credit thereafter.

**COUNT II – OBTAINING AN EXTENSION OF CREDIT THROUGH FALSE PRETENSES, FALSE REPRESENTATIONS OR FRAUD UNDER 11 U.S.C. § 523(a)(2)(A) BY REPRESENTING TO ENTERPRISE THAT BORROWERS WOULD NOT SEEK ADDITIONAL FINANCING AT THE ORIGINATION OF EACH OF THE NOTES**

119.    Enterprise incorporates its allegations above as if fully set forth below.

120.    Under the Loan Documents, Debtor caused Borrowers to represent to Enterprise that they would not seek any additional credit without the written permission of Enterprise. Exhibit A at § 8(o).

21

121.    Despite this representation, Debtor caused Borrowers to seek additional financing from both Central and Pinnacle.

122.    Enterprise did not provide permission, in writing or otherwise, for Borrowers to obtain credit from Central or Pinnacle.

123.    Debtor knew at the time he caused Borrowers to enter into each of the Loan Documents that Borrowers would seek additional financing, and that he intended to solicit additional financing from new lenders.

124.    Debtor caused Borrowers execute the Loan Documents, and therefore to represent and warrant to Enterprise that Borrowers would not seek additional financing from other lenders without Enterprise's permission for the purpose of inducing Enterprise to make the Loans.

125.    Enterprise relied on Borrowers' false representation and was misled because it understood that it would be Borrowers' only lender and that there would be no other liens on its Collateral, other than the liens that it specifically approved.

126.    Enterprise's reliance on Borrowers' representations and warranties in the Loan Documents was reasonable because, among other things, Enterprise understood that a portion of the loan proceeds would pay off prior financing Borrowers received from Pinnacle and because its due diligence did not identify any other loans.

127.    Enterprise was wrongfully induced into extending money to Borrowers and was damaged by this misrepresentation because it would not have provided the Loans to Borrowers if it knew at origination that Debtor would ultimately cause Borrowers to seek additional financing from Central and Pinnacle.

**COUNT III - OBTAINING AN EXTENSION OF CREDIT THROUGH THE USE OF A
FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B)
THROUGH BORROWERS' CONCEALMENT
OF THE PINNACLE BANK LOANS**

22

128. Enterprise incorporates its allegations above as if fully set forth below.

129. Under the Loan Agreement, Borrowers agreed not to accept any advance on the Loans without confirming that the representations and warranties set forth in Section 6 and 7 were true and correct, Loan Agreement at § 5(a)-(b).

130. Under the Loan Agreement, Borrowers represented and warranted to Enterprise that there had been no material adverse change to Borrowers' or Debtor's financial condition since the date of their most recent financial statements and that all material facts concerning the Collateral, Loan, and Borrowers' business and financial condition were disclosed.

131. Borrowers also agreed that they would not incur any additional indebtedness or borrow any money without the prior consent of Enterprise unless it was incurred to trade creditors in the ordinary course of their businesses. Loan Agreement at § 8(q).

132. After Borrowers entered into the Pinnacle Bank Loans, Borrowers provided written financial statements to Enterprise pursuant to their obligations under the Loan Documents to reflect their financial condition.

133. These financial statements were materially false because they did not disclose the debts that Borrowers owed to Pinnacle.

134. Debtor is responsible for Borrowers' failure to accurately disclose its financial condition because of his representations and warranties in the Guaranties, his ownership and control of Borrowers, and because he caused Borrowers to misrepresent their financial condition to Enterprise.

135. In making these misrepresentations, Debtor intended to deceive Enterprise by concealing the Pinnacle Bank Loans, and the associated defaults under the Loan Documents, so

23

Enterprise would provide further advances of credit, extend the maturity date of the Loans and refrain from enforcing its remedies under the Loan Documents.

136. Enterprise relied on Borrowers' false representations and was misled because it understood that it was Borrowers' only lender and that there were no other liens on its Collateral, other than the liens that it specifically approved.

137. Enterprise's reliance on Borrowers' representations was reasonable because, among other things, Borrowers and Debtor represented and warranted to Enterprise that the financial reporting provided to it were true and accurate.

138. Enterprise was damaged by Debtor's and Borrowers' failure to disclose the Pinnacle Bank Loans because Enterprise would have refrained from providing Borrowers further extensions of credit, would have declined to further extend the maturity dates for the amounts already borrowed, and would have proceeded to enforce its remedies under the Loan Documents had it known about Debtor's defaults.

**COUNT IV – OBTAINING AN EXTENSION OF CREDIT THROUGH THE USE OF A FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B) THROUGH DEBTOR'S MISREPRESENTATIONS CONCERNING HIS GUARANTIES OF THE CENTRAL BANK LOANS AND PINNACLE BANK LOANS**

139. Enterprise incorporates its allegations above as if fully set forth below.

140. Under the Guaranties, Debtor represented and warranted that the financial information provided to Enterprise, and all financial reporting information provided to Enterprise following the execution of each Guaranty, would be true and correct in all material respects and would fairly present Debtor's financial condition. Exhibit I at p. 2; Exhibit K at pp. 1-2.

141. Debtor additionally agreed to provide personal financial statements and schedules of debt within ninety days after the end of each calendar year, and to certify that those financial statements and schedules were true and accurate. Exhibit L at ¶ 19.

142.    Debtor additionally agreed to notify Enterprise in writing if Debtor's financial condition materially changed. Exhibit L at ¶ 20.

143.    Pursuant to these reporting obligations, Debtor provided Enterprise written information concerning his purported financial condition through the 2021 Financial Report.

144.    As of December 31, 2021, and prior to providing the 2021 Financial Report to Enterprise, Debtor had agreed to personally guaranty the debts owed to Central pursuant to the Central Bank Guaranty dated January 19, 2021.

145.    Debtor had also agreed to personally guaranty the debts owed to Pinnacle pursuant to an unlimited guaranty dated on or around December 30, 2021.

146.    The 2021 Financial Report was materially false because it did not disclose that Debtor had guarantied the amounts owed to Central or Pinnacle.

147.    In failing to disclose the existence of his guaranties of the Central Bank Loans and Pinnacle Bank Loans, Debtor intended to deceive Enterprise by preventing it from discovering defaults under the Loan Documents and to induce Enterprise to provide Borrowers additional extensions of credit in terms of both new financing and extensions of the maturity date of amounts already borrowed.

148.    Enterprise was misled by Debtor's omissions because it relied on Debtor's agreement in the Guaranties that the information provided to Enterprise would be true and accurate.

149.    Enterprise was damaged by Debtor's failure to disclose his guaranties of the amounts Borrowers owed to Central and Pinnacle because Enterprise would have refrained from providing Borrowers further extensions of credit, would have declined to further extend the

maturity dates for the amounts already borrowed, and would have proceeded to enforce its remedies under the Loan Documents had it known about Debtor's defaults.

### COUNT V – OBTAINING AN EXTENSION OF CREDIT THROUGH THE USE OF A FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B) BY FAILING TO DISCLOSE DEBTOR'S TAX LIABILITIES

150. Enterprise incorporates its allegations above as if fully set forth below.

151. Pursuant to Debtor's reporting obligations under the Guaranties, Debtor provided Enterprise written information concerning his purported financial condition through the 2021 Financial Report.

152. The 2021 Financial Report states Debtor had The 2021 Financial Report states that Debtor had $0.00 in "Total Current Liabilities" as of December 31, 2021. Exhibit Q at p. 1.

153. The 2021 Financial Report was materially false because Debtor owed approximately $147,168.00 in unpaid federal taxes and penalties as of December 31, 2021.

154. Debtor knew that the 2021 Financial Report was materially false when he provided it to Enterprise because he knew that he had not paid any taxes on his 2020 income, and that the only payments applied to these taxes were the application of his previous overpayment of $2,577.

155. Debtor also knew that the 2021 Financial Report was materially false when he provided it to Enterprise because his tax return, which established that he owed approximately $147,168.00 in unpaid federal taxes and penalties, was prepared by his accountant on or around October 5, 2021.

156. In failing to disclose his tax liabilities, Debtor intended to deceive Enterprise by preventing it from discovering defaults under the Loan Documents, to induce Enterprise to provide Borrowers additional extensions of credit in terms of both new financing and extensions of the maturity date of amounts already borrowed.

157. Enterprise was misled by Debtor's omissions because it relied on Debtor's agreement in the Guaranties that, among other things, (a) the information provided to Enterprise would be true and accurate; (b) Debtor would not take any action which might reasonably affect Debtor's financial condition, such as not paying his federal taxes; and (c) Debtor would inform Enterprise of material changes to his financial condition.

158. Enterprise was damaged by Debtor's failure to disclose his tax liabilities because Enterprise would have refrained from providing Borrowers further extensions of credit, would have declined to further extend the maturity dates for the amounts already borrowed, and would have proceeded to enforce its remedies under the Loan Documents had it known about Debtor's defaults.

**COUNT VI – OBTAINING AN EXTENSION OF CREDIT THROUGH THE USE OF A FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B) BY SUBMITTING FALSE FINANCIAL STATEMENTS FOR BORROWERS**

159. Enterprise incorporates its allegations above as if fully set forth below.

160. Debtor made a statement in writing to Enterprise concerning his and Borrowers' financial condition by providing it with the 2021 Financial Report.

161. The 2021 Financial Report was materially false because it represented that Borrowers had greater assets and fewer liabilities then they actually had.

162. This misrepresentation is demonstrated by the financial reporting that Debtor provided to Pinnacle through the Pinnacle Financial Report, which reports that Borrowers had fewer assets and greater liabilities then the 2021 Financial Report.

163. The Pinnacle Financial Report also includes a "Receivable From Owner" that does not appear in the 2021 Financial Report provided to Enterprise.

27

164.    In submitting materially false information in the 2021 Financial Report concerning Borrowers' assets and liabilities, Debtor intended to deceive Enterprise by preventing it from discovering defaults under the Loan Documents and to induce Enterprise to provide Borrowers additional extensions of credit in the form of new financing and extensions of the maturity date of amounts already borrowed.

165.    Enterprise was misled by Debtor's omissions because it relied on Debtor's agreement in the Guaranties that the information provided to Enterprise would be true and accurate.

166.    Enterprise was damaged by Debtor's failure to accurately describe Borrowers' financial condition because Enterprise would have refrained from providing Borrowers further extensions of credit, would have declined to further extend the maturity dates for the amounts already borrowed, and would have proceeded to enforce its remedies under the Loan Documents had it known about Debtor's defaults.

**COUNT VII – OBTAINING AN EXTENSION OF CREDIT THROUGH FALSE PRETENSES, FALSE REPRESENTATIONS OR FRAUD UNDER 11 U.S.C. § 523(a)(2)(A) BY CONCEALING THE EXISTENCE OF THE CENTRAL BANK LOANS AND PINNACLE BANK LOANS WHEN DRAWING ON THE REVOLVING LINES OF CREDIT**

167.    Enterprise incorporates its allegations above as is fully set forth below.

168.    Under the Loan Agreement, Borrowers also agreed to not accept any advance on the Loans without representing and warranting, among other things, that the representations and warranties in the Loan Agreement were true and correct as of each advance, that no event of default had occurred or was continuing, that no lien on the Collateral was created, arisen, or otherwise existed, and there was no default under the terms of the Enterprise Security Agreements. Exhibit A at § 5(a), (c)-(d).

28

169.   After obtaining credit from Central and Pinnacle, Debtor caused Borrowers to draw on the Revolving Lines of Credit.

170.   Borrowers' representations and warranties provided in connection with these draws were false in that the Central Bank Loans and Pinnacle Bank Loans were defaults under the Loan Documents and created liens on the Collateral.

171.   Debtor and Borrowers had a duty to disclose the Central Bank Loans and Pinnacle Bank Loans to Enterprise under the Loan Documents.

172.   In failing to disclose the Central Bank Loans and Pinnacle Bank Loans, Debtor intended to deceive Enterprise by preventing it from discovering defaults under the Loan Documents and to induce Enterprise to continue to allow Borrowers to draw on the Revolving Lines of Credit.

173.   Enterprise was misled by Debtor's and Borrowers' omissions because it relied on, among other things, Debtor's agreement in the Guaranties that the information provided by Enterprise from Borrowers would be true and accurate.

174.   Enterprise was damaged by Debtor's and Borrowers' failure to disclose the Central Bank Loans and Pinnacle Bank Loans because Enterprise would have denied these draw requests if these loans were disclosed and would have declared a default.

**COUNT VIII - OBTAINING FURTHER EXTENSIONS OF CREDIT THROUGH THE USE OF A FALSE STATEMENT IN WRITING UNDER 11 U.S.C. § 523(a)(2)(B) BY SUBMITTING FALSE BORROWING BASE CERTIFICATES.**

175.   Enterprise incorporates its allegations above as if fully set forth below.

176.   Under the Loan Documents, the amounts Borrowers could draw upon under the Revolving Lines of Credit were determined by the submission of certain information concerning Borrowers' financial condition to Enterprise through the Borrowing Base Certificates.

29

177. The Borrowing Base Certificates submitted after the origination of the Central Bank Loans and Pinnacle Bank Loans listed amounts for "Eligible Inventory" which were not in fact eligible because Central's and Pinnacle's liens.

178. The Borrowing Base Certificates provided by Borrowers also incorrectly noted $0 for the "Current Borrowings Outstanding," despite the fact that both the Revolving Lines of Credit had balances.

179. In causing Borrowers to submit inaccurate Borrowing Base Certificates, Debtor intended to deceive Enterprise as to the amount of the Apex Borrowing Base and Mag Borrowing Base to cause Enterprise to allow Borrowers to make greater draws on the Revolving Lines of Credit then what would be allowed if accurate information were provided to Enterprise.

180. Debtor caused Borrowers to draw on the Revolving Lines of Credit after entering into the Central Bank Loans and Pinnacle Bank Loans despite the inaccuracies in the Borrowing Base Certificates.

181. Enterprise reasonably relied on the Borrowing Base Certificates to calculate the amounts that could be extended to Borrowers under the Revolving Lines of Credit because, among other things, Debtor and Borrowers represented and warranted that the financial reporting information provided to Enterprise would be true and accurate.

182. Enterprise was damaged by Debtor's and Borrowers' misrepresentations in the Borrowing Base Certificates because, if Enterprise received accurate financial reporting from Borrowers, it would not have allowed Borrowers to draw on the Revolving Lines of Credit.

**COUNT IX - OBTAINING A RENEWAL OR REFINANCE OF CREDIT THROUGH THE USE OF FALSE PRETENSES, FALSE REPRESENTATIONS OR FRAUD UNDER 11 U.S.C. § 523(a)(2)(A) BY INDUCING ENTERPRISE TO EXTEND THE MATURITY DATE OF THE NOTES**

183. Enterprise incorporates its allegations above as if fully set forth below.

184. As described more fully above, Debtor and Borrowers continued to represent to Enterprise that they were in compliance with the Loan Documents up until they disclosed the Pinnacle Bank Loans in the summer of 2023.

185. These representations were false because Borrower had entered into the Central Bank Loans and Pinnacle Bank Loans, had submitted false financial reports to Enterprise regarding the financial condition of Borrowers and Debtor, and had concealed Debtor's tax liabilities.

186. Debtor made these representations for the purpose of deceiving Enterprise to induce it to provide extensions of the maturity dates on the Notes that it would not have otherwise provided if fully informed of Borrowers' and Debtor's defaults.

187. Specifically, Enterprise provided the following extensions for the maturity dates of the Second Note and Third Note:

   a. On November 30, 2020, Enterprise and Borrowers amended the Second Note by, among other things, extending the maturity date of the Second Note to November 29, 2021.

   b. On November 29, 2021, Enterprise and Borrowers amended the Second Note to, among other things, extend the maturity date of the Second Note to May 28, 2022.

   c. On May 28, 2022, Enterprise and Borrowers amended the Second Note to, among other things, extend the maturity date of the Second Note to November 24, 2022.

   d. On November 29, 2021, Enterprise and Borrowers amended the Third Note to, among other things, extend the maturity date to May 28, 2022.

   e. On May 28, 2022, Enterprise and Borrowers amended the Third Note to, among other things, extend that maturity date to November 24, 2022.

188. Enterprise relied on, among other things, Borrowers' and Debtor's representations regarding their compliance with the Loan Documents in providing these extensions and would not have agreed to provide these extensions if it knew of the defaults described above.

31

189. Enterprise was justified to rely on Borrowers' and Debtor's representations concerning their compliance with the Loan Documents because of their agreement to provide Enterprise accurate information and their representations and warranties in connection with their draws on the Loans. Exhibit A at § 5(a), (c)-(d).

190. Enterprise was damaged and suffered loss resulting from Debtor and Borrowers' misrepresentations because it would not have agreed to extend the maturity dates of the Second Note and Third Note if it had known of Debtor and Borrowers' defaults and would have instead enforced its remedies under the Loan Documents.

**COUNT X - OBTAINING A RENEWAL OR REFINANCE OF CREDIT THROUGH THE USE OF FALSE PRETENSES, FALSE REPRESENTATIONS OR FRAUD UNDER 11 U.S.C. § 523(a)(2)(A) BY INDUCING ENTERPRISE TO EXTEND ADDITIONAL CREDIT UNDER THE THIRD NOTE**

191. Enterprise incorporates its allegations above as if fully set forth below.

192. As described more fully above, Debtor and Borrowers continued to represent to Enterprise that they were in compliance with the Loan Documents up until they disclosed the Pinnacle Bank Loans in summer of 2023.

193. These representations were false because during this time, Debtor was not paying his personal income taxes and was incurring significant tax liability with the Internal Revenue Service as demonstrated by the Debtor 2020 Tax Return.

194. Debtor was on notice that he was incurring significant tax liability because of his significant income in 2020.

195. Despite this income, Debtor's only payment to his 2020 federal taxes was the application of his previous overpayment of $2,577.

196. Indeed, Debtor represented in his 341 Meeting, that it was his practice to not pay his taxes and to instead enter into a payment plan with the Internal Revenue Service each year.

32

197.   Debtor omitted references to his tax liabilities in his financial reporting for the purpose of deceiving Enterprise to induce it to extend Borrowers further credit under the Third Note.

198.   Specifically, Enterprise provided the following further extensions of credit after the origination of the Third Note:

   a.   On February 11, 2020, Enterprise and Borrowers amended the Third Note to, among other things, increase the principal balance of the Third Note from a maximum principal balance of $2,000,000.00 to $2,375,000.00.

   b.   On November 30, 2020, Enterprise and Borrowers amended the Third Note to, among other things, increase the principal balance of the Third Note to $4,000,000.00 and to extend the maturity date to November 29, 2021.

199.   Enterprise would not have provided these extensions had it been fully informed Debtor's defaults.

200.   Enterprise relied on Borrowers' and Debtor's representations concerning their compliance with the Loan Documents because it would not have agreed to provide Borrowers this additional credit if it knew of the defaults described above.

201.   Enterprise was justified in relying on Borrowers' and Debtor's representations concerning their compliance with the Loan Documents because, among other things, their agreement to provide Enterprise accurate information and their representations and warranties in connection with their draws on the Loans. Exhibit A at § 5(a), (c)-(d).

202.   Enterprise was damaged and suffered loss resulting from Debtor and Borrowers' misrepresentations because it would not have agreed to extend this additional credit under the Third Note if it had known of Debtor and Borrowers' defaults and would have instead enforced its remedies under the Loan Documents.

**COUNT XI – OBTAINING A RENEWAL OR REFINANCE OF CREDIT THROUGH THE USE OF FALSE PRETENSES, FALSE REPRESENTATIONS OR FRAUD UNDER**

**11 U.S.C. § 523(a)(2)(A) BY INDUCING ENTERPRISE TO FORBEAR FROM
EXERCISING ITS RIGHTS UNDER THE LOAN DOCUMENTS**

203. Enterprise incorporates its allegations above as if fully set forth below.

204. On March 30, 2023, Borrowers entered into the Forbearance Agreement in which they acknowledged their defaults pursuant to the maturity of the Notes, and Enterprise agreed to forbear on Borrowers' defaults until May 31, 2023.

205. Pursuant to the Forbearance Agreement, all of Borrowers' and Debtor's obligations under the Loan Documents continued with full force and effect. Forbearance Agreement at § 9(a).

206. Other than the maturity of the Notes, and pursuant to their continued reporting requirements and representations and warranties under the Loan Documents, Borrowers and Debtor represented that there were no further defaults under the Loan Documents as of the date of the Forbearance Agreement.

207. These representations were false because, among other defaults, Borrowers had entered into the Central Bank Loans and Pinnacle Bank Loans, had submitted false financial reports to Enterprise, and had concealed Debtor's tax liabilities.

208. Debtor made these false representations to induce Enterprise to enter into the Forbearance Agreement and to case Enterprise to forbear from exercising its rights and remedies pursuant to the maturities of the Notes.

209. Enterprise was justified in relying on Borrowers' and Debtor's representations because, among other things, Debtor and Borrowers agreed to provide Enterprise accurate information in connection with the Forbearance Agreement.

210. Enterprise was damaged and suffered loss resulting from Debtor and Borrowers' misrepresentations because it would not have agreed to enter into the Forbearance Agreement if it

34

had known of Debtor and Borrowers' defaults and would have instead enforced its remedies under the Loan Documents.

**PRAYER FOR RELIEF**

WHEREFORE, Enterprise prays that the Court enter a judgement against Debtor as following:

(a)     Exempting Enterprise's claims against Debtor from the discharge of debts under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B);

(b)     For Enterprise's costs and fees in this matter;

(c)     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: /s/ *William J. Easley*

William J. Easley          MO # 70041
1200 Main Street, Suite 3800
Kansas City, Missouri 64105-2100
Telephone: (816) 374-3200
Facsimile:  (816) 374-3300
will.easley@bclplaw.com

Attorney for Enterprise Bank and Trust

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2025, a true and correct copy of the foregoing pleading was filed with the Clerk of the Bankruptcy Court by using the CM/ECF system, which sent notification of the electronic filing to all parties of interest that have registered in this case.

*/s/ William J. Easley*
Attorney for Enterprise Bank and Trust

35