# Exhibit A

## BUSINESS LOAN AGREEMENT

**THIS BUSINESS LOAN AGREEMENT** is made effective December 2, 2019 by and between **FORCE MIDWEST, LLC,** a Missouri limited liability company, **APEX SPECIALTY VEHICLES, LLC,** a Missouri limited liability company, **MAG TRUCKS, LLC,** a Missouri limited liability company, **MULUNGAS, LLC,** a Missouri limited liability company, **MID WESTERN AUTOMOTIVE, LLC,** a Missouri limited liability company, and **FORCE COMMERCIAL BUILDING, LLC,** a Missouri limited liability company, and **ENTERPRISE BANK & TRUST,** a Missouri chartered trust company.

RECITALS:

(A)     Certain capitalized words and terms used herein are defined in Section 2 hereof.

(B)     Borrower has applied to Lender for the Loan to (i) refinance certain debt owed by Borrower and (ii) provide working capital to Borrower.

(C)     Lender agrees to make, and Borrower agrees to borrow, the Loan upon the terms and subject to the conditions hereinafter set forth.

(D)     Lender and Borrower desire to fully set forth their rights and obligations with respect to the Loan.

NOW THEREFORE, in consideration of the premises, the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower, subject to and upon the following terms and conditions:

1.     INCORPORATION OF RECITALS.   The Recitals to this Loan Agreement are incorporated herein as part of this Loan Agreement.

2.     DEFINITIONS.   As used in this Loan Agreement and in any other Loan Document which incorporates the definitions set forth in this Section 2, the following words and terms, when capitalized shall, unless the context clearly indicates otherwise, have the meanings indicated in this Section 2:

"Account" shall mean any trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower and includes the Apex Accounts.

"Advances" shall mean advances of proceeds of the Loan to be made by Lender under this Loan Agreement from time to time.

"Agreed Accounting Principles" shall mean GAAP or other principles of accounting acceptable to Lender in its sole discretion.

7C72093.DOC

"Anti-Terrorism Law" shall mean any laws relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001, as amended from time to time, and the U.S. Bank Secrecy Act of 1970, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, and as otherwise amended from time to time.

"Apex" shall mean **APEX SPECIALTY VEHICLES, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

"Apex Accounts" shall mean any trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Apex (or to a third party grantor acceptable to Lender).

"Apex Account Debtor" shall mean the Person obligated upon an Apex Account.

"Apex Authorized Person" shall mean an individual or individuals authorized by resolutions of Apex, in form and substance acceptable to Lender, to request Advances of the Apex Line of Credit Loan.

"Apex Borrowing Base" shall mean an amount equal to the sum (i) 80% of Apex's Eligible Accounts as determined by Lender and (ii) 50% of the cost of Apex's Eligible Inventory as determined by Lender. The Apex Borrowing Base shall be determined by Lender, from time to time, upon receipt and review of Apex Borrowing Base Certificate, accounts receivable aging report, monthly inventory report, and such other documents and inspections as Lender may from time to time require.

"Apex Borrowing Base Certificate" shall mean a written certification by Apex to Lender of the of the amount of the Apex Eligible Accounts, the amount of the Apex Eligible Inventory and the amount of the Apex Borrowing Base as of the date of each such certification to be submitted to Lender on such form or forms, and with such supporting information, as are required by Lender.

"Apex Eligible Account" shall mean at any time, all of the Apex Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Apex Eligible Account against which Apex may borrow shall exclude all returns, discounts, credit, offsets of any nature and shall be reduced by the amount of any invoices not paid within 90 days after the invoice date.

Unless otherwise agreed to by Lender in writing, Apex Eligible Accounts do not include:

(a)     Apex Accounts with respect to which the Apex Account Debtor is a Member, employee, or agent of Borrower;

(b)     Apex Accounts with respect to which the Apex Account Debtor is a Borrower Affiliate, or affiliated with Borrower's Members;

7C72093.DOC

(c)     Apex Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Apex Account Debtor may be conditioned.

(d)     Apex Accounts with respect to which Apex is or may become liable to the Apex Account Debtor for goods sold or services rendered by the Apex Account Debtor to Apex;

(e)     Apex Accounts which are subject to dispute, counterclaim, or setoff;

(f)     Apex Accounts with respect to which the goods invoiced have not been shipped or delivered, or the services have not been rendered, to the Apex Account Debtor;

(g)     Apex Accounts with respect to which Lender, in its sole and absolute discretion, deems the creditworthiness or financial condition of the Apex Account Debtor to be unsatisfactory; and

(h)     Apex Accounts of any Apex Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts, or who has had appointed a trustee, custodian, or receiver for its assets, or who has made an assignment for the benefit of creditors, or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due, or has shall voluntarily and permanently ceased transaction of its business.

"Apex Eligible Inventory" shall mean, at any time, the entire Apex Inventory, except:

(a)     Apex Inventory which is not owned by Apex free and clear of all security interests, including purchase money security interests, liens, encumbrances, and claims of third parties;

(b)     Apex Inventory which Lender, in its sole discretion, deems to be obsolete, unsalable, damaged, defective, or unfit for further processing; and

(c)     Work in progress.

"Apex Inventory" shall mean all of Apex's raw materials, work in progress, finished goods, merchandise, parts and supplies, of any kind and description, and goods, including vehicles, held for sale or lease or furnished under contracts of service in which Apex now has or hereafter acquires any right, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering the foregoing.  Inventory includes items that otherwise would be included in Apex Inventory temporarily out of Apex's custody or possession and all returns on Apex Accounts.

7C72093.DOC

"Apex Line of Credit Loan" shall mean the loan in the Apex Line of Credit Loan Amount to be made by Lender to Borrower that shall be disbursed to Apex pursuant to this Loan Agreement.

"Apex Line of Credit Loan Amount" shall mean the maximum principal amount of $1,000,000.00 as stated in the Apex Line of Credit Note.

"Apex Line of Credit Maturity Date" shall mean the maturity date as set forth in the Apex Line of Credit Note.

"Apex Line of Credit Note" shall mean that certain Promissory Note of even date herewith made by Apex, payable to Lender or its order, in the Apex Line of Credit Loan Amount, bearing interest as in the Apex Line of Credit Note specified, with interest and principal payable and prepayment provisions as in the Apex Line of Credit Note specified, maturing on the Apex Line of Credit Maturity Date, and any and all amendments, modifications, supplements, replacements, extensions, renewals, increases, refundings and restatements thereof hereafter made.

Apex Pledged Property" shall mean Apex Accounts, the Apex Inventory, and all other personal property owned by Apex that has been pledged by Apex to Lender under the Apex Security Agreement to secure repayment of the Loan.

"Apex Security Agreement" shall mean that certain Security Agreement of even date herewith between Apex and Lender and any amendments thereto hereafter made.

"Apex Term Loan" shall mean the loan in the Apex Term Loan Amount to be made by Lender to Borrower that shall be disbursed to Apex pursuant to this Loan Agreement.

"Apex Term Loan Amount" shall mean the maximum principal amount of $662,914.00 as stated in the Apex Term Loan Note.

"Apex Term Loan Maturity Date" shall mean the maturity date as set forth in the Apex Term Loan Note.

"Apex Term Loan Note" shall mean that certain Promissory Note of even date herewith made by Apex, payable to Lender or its order, in the Apex Term Loan Amount, bearing interest as in the Apex Term Loan Note specified, with interest and principal payable and prepayment provisions as in the Apex Term Loan Note specified, maturing on the Apex Term Loan Maturity Date, and any and all amendments, modifications, supplements, replacements, extensions, renewals, increases, refundings and restatements thereof hereafter made.

"Automatic Acceleration Event of Default" shall mean the Events of Default described in Sections 11 (r), and (s) hereof.

7C72093.DOC

"Borrower" shall mean, collectively Apex, Force, MAG, Mulungas, Mid Western, and Force Commercial and separately any one of Apex, Force, MAG, Mulungas, Mid Western, or Force Commercial

"Borrower's Address" shall mean 3320 S. Outer Belt Road, Grain Valley, Missouri 64029 or such other address as Borrower, by written notice to Lender, shall designate as "Borrower's Address" for purposes of the Loan Documents.

"Borrower Affiliate" shall mean any Guarantor, any Member, or any Person who is directly, or indirectly through one or more intermediaries, Controlled by or under common Control with Borrower

"Borrower's Collateral" shall mean the Mortgaged Property, the Apex Pledged Property, the MAG Pledged Property, the Equipment, and all other personal property owned by Borrower that has been pledged or assigned by Borrower to Lender under the Loan Documents to secure repayment of the Loan.  The Borrower's Collateral shall include the proceeds and products of the Borrower's Collateral, including, but not limited to, the proceeds of any insurance.

"Borrower's Principal Place of Business" shall mean Borrower's facility located at 3320 S. Outer Belt Road, Grain Valley, Missouri 64029 or such other locations as Borrower, by written notice to Lender shall designate as "Borrower's Principal Place of Business" for purposes of the Loan Documents.

"Casualty" shall mean any damage, destruction, or loss to or of any of the Mortgaged Property resulting from fire, any peril insured against, or any other cause.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. " 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), and as now or hereafter amended.

"Closing" shall mean the execution and delivery of the Loan Documents and their acceptance by Lender and satisfaction of all conditions of the Loan Agreement to the making of the Loan.

"Closing Date" shall mean the date upon which the Closing is completed.

"Code" shall mean the Uniform Commercial Code, as adopted and in effect in the State of Missouri on the date hereof and as amended or supplemented at any time hereafter.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlled" shall have the meaning correlative thereto.

"Condemnation" shall mean any condemnation or taking of any of the Mortgaged Property or the use thereof by any Governmental Authority or other Person pursuant to the power of

7C72093.DOC

eminent domain or condemnation, and any conveyance of any of the Mortgaged Property in lieu of condemnation.

"Condemnation Award" shall mean any and all awards, damages and other sums of money at any time owed or becoming payable, or paid, with respect to any Condemnation, including any payments for any conveyance in lieu of Condemnation, and awards for changes of grade of any streets.

"Debt" shall mean (i) all indebtedness of Borrower evidenced by the Note, whether now existing or hereafter contracted or incurred and whether principal, interest, late charges, interest after default or otherwise, (ii) any and all extensions, renewals, refinancings or refundings of any of such indebtedness in whole or in part, whether or not now provided for in the Loan Documents, (iii) all costs and expenses incurred by Lender in the collection of any of such indebtedness, including attorneys' fees and legal expenses, (iv) all future advances made by Lender for the maintenance, protection, preservation or enforcement of, or realization upon, any of the Borrower's Collateral including without limiting the generality of the foregoing all advances for storage, transportation charges, taxes, insurance, repairs and the like, and (v) all other amounts coming due to Lender under any provision of any of the Loan Documents, including all liability of Borrower to Lender whether liquidated or unliquidated, defined, contingent, conditional or of any other nature whatsoever, and performance of all other obligations, arising under any swap, derivative, foreign exchange or hedge transaction or arrangement (or other similar transaction or arrangement howsoever described or defined) at any time entered into with Lender in connection with the Note or the Loan.

"Default Rate" shall mean the highest default rate established under the terms of the Notes.

"Environmental Law" shall mean, collectively, CERCLA, the Hazardous Materials Transportation Act (49 U.S. C. Section 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), and all other federal, state or local statutes, ordinances, codes, rules, regulations, judgments, orders and decrees regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material as now or at any time hereafter in effect, each as now or hereafter amended, and all permits, licenses, authorizations, concessions, grants, franchises, agreements or other governmental restrictions or requirements relating to the protection of the environment or to any Hazardous Substance.

"Equipment" shall mean all of Borrower's goods used or acquired for use primarily in Borrower's business and which are not included in inventory, whether now or hereafter existing, but excluding therefrom all equipment used in Borrower's business that is subject to a lease or lease-purchase agreements.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

7C72093.DOC

"Event of Default" shall mean any Event of Default described in Section 11 of this Loan Agreement, and any event, omission or circumstance otherwise specifically stated in the Loan Documents to be an Event of Default.

"Force" shall mean **FORCE MIDWEST, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

"Force Commercial" shall mean **FORCE COMMERCIAL BUILDIING, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

"Force Commercial Improvements" shall mean collectively all the buildings and improvements from time to time situated on the Force Commercial Land whether now existing or hereafter erected.

"Force Commercial Land" shall mean all of the real property and rights in real property described on Exhibit A to the Force Commercial Mortgage as intended to be subject to the lien thereof.

"Force Commercial Mortgage" shall mean that certain Deed of Trust dated April 30, 2019 executed by Force Commercial in favor of Lender as amended by an Amendment to Deed of Trust dated of even date herewith by and between Force Commercial and Lender securing the Loan, encumbering among other things the Force Commercial Land and the Force Commercial Improvements, and any amendments or supplements to the same hereafter made.

"Force Commercial Mortgaged Property" shall mean all real and personal property and rights in property, encumbered by, or assigned by, or a security interest in or pledge of which is granted by, the Force Commercial Mortgage.

"Force Commercial Security Agreement" shall mean that certain Security Agreement of even date herewith between Force Commercial and Lender and any amendments thereto hereafter made.

"Force Security Agreement" shall mean that certain Security Agreement of even date herewith between Force and Lender and any amendments thereto hereafter made.

"Forfeiture Law" shall mean all federal or state laws which provide for any forfeiture of assets as a potential penalty, including without limitation, the Racketeer Influenced and Corrupt Organizations Act of 1970, as now or hereafter amended.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States of America, consistently applied.

"Governmental Authorities" shall mean the United States of America, the State of Missouri, or any political subdivision of any of them, and any court, agency, department,

7C72093.DOC

commission, board, bureau, officer or instrumentality of any one of them or of any such political subdivision; and "Governmental Authority" shall mean any one of the Governmental Authorities.

"Guarantor" shall mean any one of the Guarantors.

"Guarantors" shall mean Brad Carlson and any other person or entity who shall now or hereafter give to Lender a guaranty of any obligation of Borrower to Lender under the Loan Documents.

"Guaranty" shall mean the Guaranty Agreements of even date herewith, given to Lender by the Guarantor with respect to the Loan and all other obligations of Borrower under the Loan Documents, and any amendments thereto hereafter made.

"Hazardous Substance" shall mean: (a) any "hazardous substance" as such term is presently defined in CERCLA; (b) any additional substances or materials which are hereafter incorporated in or added to the definition of "hazardous substance" for the purposes of CERCLA; (c) any element, substance, compound or mixture, including disease-causing agents, now or hereafter designated as, or containing components designated as, hazardous, dangerous, toxic, harmful, and/or subject to regulation by any Environmental Law, including asbestos in any form and any substance containing asbestos, mold, urea formaldehyde foam insulation, transformers or other equipment which contains dielectric fluid or polychlorinated biphenyls, flammable explosives, lead, radioactive materials, chemicals known to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions or related materials and any waste, substance or material now or hereafter regulated by any Environmental Law; (d) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Section 2014, as now or hereafter amended; (e) any lead-based paint; and (f) mold, fungus, microbacterial contamination or pathogenic organisms.

"Impositions" shall mean all taxes and assessments of every kind and nature now or hereafter assessed against or levied upon any of the Borrower's Collateral or the revenues, rents, issues or profits thereof by any Governmental Authority.

"Improvements" shall mean collectively the Force Commercial Improvements and the Mulungas Improvements and separately either the Force Commercial Improvements or the Mulungas Improvements.

"Indebtedness" shall mean (a) all indebtedness created, assumed or incurred in any manner by Borrower representing money borrowed (including by the issuance of debt securities), (b) all indebtedness of Borrower for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (c) all indebtedness secured by any lien upon any property of Borrower, whether or not Borrower has assumed or become liable for the payment of such indebtedness, and (d) all obligations of Borrower on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

7C72093.DOC

"Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated of even herewith executed by Borrower, and Guarantor in favor of Lender with respect to the Mortgaged Property and any amendments or supplements to the same hereafter made.

"Inventory" shall mean the all of Borrower's raw materials, work in progress, finished goods, merchandise, parts and supplies, of any kind and description, and goods, including vehicles, held for sale or lease or furnished under contracts of service in which Borrower now has or hereafter acquires any right, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering the foregoing.   Inventory includes Apex Inventory, the MAG Inventory and also includes items that otherwise would be included in Inventory temporarily out of Borrower's custody or possession and all returns on accounts.

"Land" shall mean collectively the Force Commercial Land and the Mulungas land and separately either the Force Commercial Land or the Mulungas Land.

"Lease" shall mean any of the Leases.

"Leases" shall mean all agreements for use and occupancy of all or any part of the Land and Improvements, now existing or hereafter entered into, including (a) the entire lessor's interest in all present and future leases (including subleases), licenses and concessions (including rights in respect of tenants holding over and tenancies following attornment) covering all or any portion of the Mortgaged Property, (b) all agreements for use or occupancy of any portion of the Mortgaged Property, (c) any and all guaranties of the performance of any lessee or party under any lease, license or concession, (d) all cash or securities deposited with the Borrower to secure performance of the tenant's obligations under such Lease, (e) any and all extensions, modifications, renewals or supplements to any lease, license or concession (including any guaranty or other item included in this definition of "Leases").

"Legal Requirements" shall mean collectively (i) all present and future laws, ordinances, orders, rules, regulations and requirements of all Governmental Authorities; and (ii) all covenants, contract rights, and conditions now or hereafter agreed to by Borrower which may apply to any of the Borrower's Collateral or the use, possession, or enjoyment thereof.

"Lender" shall mean **ENTERPRISE BANK & TRUST**, its successors, and any subsequent holder or holders of the Note.

"Lender's Address" shall mean, 12695 Metcalf Avenue, Overland Park, Kansas 66213 Attention: Aaron Wiens, or such other address as Lender, by written notice to Borrower, shall designate as "Lender's Address" for purposes of the Loan Documents.

"Lien" shall mean any security agreement, financing statement, security interest, judgment lien, mechanic's or materialmen's lien, any other lien, encumbrance, charge, retention or reservation of title as security, pledge, hypothecation or assignment, of any of, or upon, the Borrower's Collateral, whether now existing or hereafter created, suffered or incurred.

7C72093.DOC

"Loan" shall mean collectively the Apex Line of Credit Loan, the MAG Line of Credit Loan the Apex Term Loan, and the Mulungas Term Loan and separately any one of the Apex Line of Credit Loan, the MAG Line of Credit Loan, the Apex Term Loan, or the Mulungas Term Loan.

"Loan Agreement" shall mean this Business Loan Agreement, as the same may be subsequently amended, modified or supplemented.

"Loan Documents" shall mean this Loan Agreement, the Apex Line of Credit Note, the MAG Line of Credit Note, the Apex Term Note, the Mulungas Term Note, the Security Agreement, the Mortgage, the Mulungas Assignment of Rents, the Guaranty, the Second Deed of Trust, and all other documents executed by Borrower contemporaneously herewith in connection with the Loan, as well as all the financing statements and any other documents necessary or appropriate to perfect the security interests created by the Security Agreement, and other Loan Documents, each other instrument, document or agreement now or hereafter evidencing, securing or supporting the Loan, and any amendments and supplements to any of the same hereafter made.

"MAG" shall mean **MAG TRUCKS, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

"MAG Authorized Person" shall mean an individual or individuals authorized by resolutions of MAG, in form and substance acceptable to Lender, to request Advances of the MAG Line of Credit Loan.

"MAG Borrowing Base" shall mean an amount equal to the sum of (i) 100% of the cost of MAG's Eligible Box Truck and Step Van Inventory as determined by Lender and (ii) the lesser of (a) 100% of the cost of MAG's Eligible Kanban Inventory as determined by Lender or (b) $1,000,000.00. The MAG Borrowing Base shall be determined by Lender, from time to time, upon receipt and review of MAG Borrowing Base Certificate, accounts receivable aging report, monthly inventory report, and such other documents and inspections as Lender may from time to time require.

"MAG Borrowing Base Certificate" shall mean a written certification by MAG to Lender of the amount of the MAG Eligible Box Truck and Step Van Inventory, the amount of the MAG Eligible Kanban Inventory, and the amount of the MAG Borrowing Base as of the date of each such certification to be submitted to Lender on such form or forms, and with such supporting information, as are required by Lender.

"Mag's Eligible Box Truck and Step Van Inventory" shall mean, at any time, Borrower's entire inventory of ready and available for sale box trucks and independent service provider step vans but shall exclude any food trucks and custom conversion trucks or vans.

"MAG's Eligible Kanban Inventory" shall mean, at any time, Borrower's entire inventory of ready and available for sale food trucks and custom conversion trucks or vans.

7C72093.DOC

"MAG Inventory" shall mean all of MAG's raw materials, work in progress, finished goods, merchandise, parts and supplies, of any kind and description, and goods, including vehicles, held for sale or lease or furnished under contracts of service in which MAG now has or hereafter acquires any right, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering the foregoing. Inventory includes items that otherwise would be included in MAG Inventory temporarily out of MAG's custody or possession.

"MAG Line of Credit Loan" shall mean the loan in the MAG Line of Credit Loan Amount to be made by Lender to Borrower that shall be disbursed to MAG pursuant to this Loan Agreement.

"MAG Line of Credit Loan Amount" shall mean the maximum principal amount of $2,000,000.00 as stated in the MAG Line of Credit Note.

"MAG Line of Credit Maturity Date" shall mean the maturity date as set forth in the MAG Line of Credit Note.

"MAG Line of Credit Note" shall mean that certain Promissory Note of even date herewith made by Borrower, payable to Lender or its order, in the MAG Line of Credit Loan Amount, bearing interest as in the MAG Line of Credit Note specified, with interest and principal payable and prepayment provisions as in the MAG Line of Credit Note specified, maturing on the MAG Line of Credit Maturity Date, and any and all amendments, modifications, supplements, replacements, extensions, renewals, increases, refundings and restatements thereof hereafter made.

MAG Pledged Property" shall mean MAG's Eligible Box Truck and Step Van Inventory, Mag's Eligible Kanban Inventory, and all other personal property owned by MAG that has been pledged by MAG to Lender under the MAG Security Agreement to secure repayment of the Loan.

"MAG Security Agreement" shall mean that certain Security Agreement of even date herewith between MAG and Lender and any amendments thereto hereafter made.

"Maintenance" shall mean all repairs, renewals, replacements, alterations, additions, betterments and improvements to the Mortgaged Property (whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen), that are necessary to keep the Mortgaged Property in good order, condition and repair, consistent with the standard described in Section 9(c) of this Loan Agreement.

"Member" shall mean any member of Apex, Force, MAG, Mulungas, Mid Western, or Force Commercial.

"Mid Western" shall mean **MID WESTERN AUTOMOTIVE, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

7C72093.DOC

"Mid Western Security Agreement" shall mean that certain Security Agreement of even date herewith between Mulungas and Lender and any amendments thereto hereafter made.

"Mortgage" shall mean collectively the Force Commercial Mortgage and the Mulungas Mortgage and separately either the Force Commercial Mortgage or the Mulungas Mortgage.

"Mortgaged Property" shall mean collectively the Force Commercial Mortgage Property and the Mulungas Mortgaged Property and separately either the Force Commercial Mortgage Property or the Mulungas Mortgaged Property.

"Mulungas" shall mean **MULUNGAS, LLC,** a Missouri limited liability company, its successors and assigns permitted under the Loan Documents.

"Mulungas Assignment of Rents" that certain Assignment of Leases and Rents of even date herewith executed by Mulungas in favor of Lender assigning to Lender certain rents from the Mulungas Land and the Mulungas Improvements, and any amendments thereto hereafter made.

"Mulungas Improvements" shall mean collectively all the buildings and improvements from time to time situated on the Mulungas Land whether now existing or hereafter erected.

"Mulungas Land" shall mean all of the real property and rights in real property described on Exhibit A to the Mulungas Mortgage as intended to be subject to the lien thereof.

"Mulungas Mortgage" shall mean that certain an Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Financing Statement (Future Advance) dated of even date herewith executed by Mulungas in favor of Lender securing the Loan, encumbering among other things the Mulungas Land and the Mulungas Improvements, and any amendments or supplements to the same hereafter made.

"Mulungas Mortgaged Property" shall mean all real and personal property and rights in property, encumbered by, or assigned by, or a security interest in or pledge of which is granted by, the Mulungas Mortgage.

"Mulungas Security Agreement" shall mean that certain Security Agreement of even date herewith between Mulungas and Lender and any amendments thereto hereafter made.

"Mulungas Term Loan" shall mean the loan in the Mulungas Term Loan Amount to be made by Lender to Borrower that shall be disbursed to Mulugas pursuant to this Loan Agreement.

"Mulungas Term Loan Amount" shall mean the maximum principal amount of $662,914.00 as stated in the Mulungas Line of Credit Note.

"Mulungas Term Loan Maturity Date" shall mean the maturity date as set forth in the Mulungas Term Loan Note.

7C72093.DOC

Force Midwest LLC *et. al*
Business Loan Agreement – Page 12

"Mulungas Term Loan Note" shall mean that certain Promissory Note of even date herewith made by Mulungas, payable to Lender or its order, in the Mulungas Term Loan Amount, bearing interest as in the Mulungas Term Loan Note specified, with interest and principal payable and prepayment provisions as in the Mulungas Term Loan Note specified, maturing on the Mulungas Term Loan Maturity Date, and any and all amendments, modifications, supplements, replacements, extensions, renewals, increases, refundings and restatements thereof hereafter made.

"Note" shall mean collectively the Apex Line of Credit Note, the MAG Line of Credit Note, the Apex Term Note, and the Mulungas Term Note and separately any one of the Apex Line of Credit Note, the MAG Line of Credit Note, the Apex Term Note, or the Mulungas Term Note.

"Occupancy Permits" shall mean all authorizations, certificates, permits, licenses and approvals required by any of the Governmental Authorities for the occupancy, use, and operation of the Mortgaged Property in accordance with the Permitted Uses.

"Obligations" shall mean the obligation to make prompt and punctual payment of the Debt, and all other obligations of Borrower to Lender arising from or out of the Loan Documents.

"Person" shall mean any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, unincorporated association, trust or any other legal entity.

"Permitted Encumbrances" shall mean the matters affecting title to the Land or other Mortgaged Property that are listed as exceptions to coverage on Schedule B to the Title Policy insuring the lien of the Mortgage.

"Permitted Uses" shall mean the use of the Land and Improvements (a) for the conversion, sale and storage of new and used vans and trucks and such ancillary uses as are usual and customary in association with conversion and sale of new and used vans and trucks and (b) the use of the Improvements for offices and such ancillary uses as are usual and customary in association with office use.

"Primary Deposit Account" shall mean the deposit accounts maintained by each Borrower into which substantially all of the receipts from the operations of each Borrower are deposited and from which substantially all of the disbursements for the operations of each Borrower are made.

"Restoration" shall mean the restoration, repair, rebuilding, alteration and/or replacement of any of the Mortgaged Property made necessary by any Casualty or Condemnation, to a condition as nearly as possible to its condition prior to such Casualty or Condemnation (but with such changes as Borrower may make as permitted by the Loan Agreement), and includes demolition, temporary repairs and the protection of the Mortgaged Property pending the

7C72093.DOC

completion of Restoration.

"Security Agreement" shall mean the Apex Security Agreement, the Force Security Agreement, MAG Security Agreement, the Mulungas Security Agreement, the Mid Western Security Agreement, and the Force Commercial Security Agreement and separately any one of the Apex Security Agreement, the Force Security Agreement, the MAG Security Agreement, the Mulungas Security Agreement, the Mid Western Security Agreement, or the Force Commercial Security Agreement.

"Second Deed of Trust" shall mean that certain Deed of Trust dated July 24, 2019 executed by Mulungas in favor of Lender encumbering among other things the Mulungas Land and the Mulungas Improvements, and any amendments or supplements to the same hereafter made.

"Title Company" and "Title Insurer" shall mean First American Title Insurance Company.

"Title Policy" shall mean a mortgagee policy of title insurance issued by the Title Company to Lender with all pre-printed standard exceptions deleted, insuring the lien of the Mortgage as a first lien upon the Mortgaged Property, and satisfactory to Lender in all respects, including any endorsements and affirmative coverages Lender may require.

"Transfer" shall mean: (a) the conveyance of the any of the Mortgaged Property or any right, title or interest in the any of the Mortgaged Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contact, land contract, contract for deed, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to any of the Mortgaged Property or by any other method of conveyance of an interest in the any of the Mortgaged Property; (b) with respect to any Member's interest in Borrower, any sale, assignment, conveyance, transfer, grant of a security interest in, or encumbrance of any such ownership interest, or any agreement to do so; and (c) any transfer defined as an "Accelerating Transfer" under the terms of the Mortgage.

3.     USE OF PROCEEDS. The proceeds of the Loan will be used solely to refinance Borrower's existing loan obligations and to provide working capital for Borrower's business operations.

4.     ADVANCES ON THE LOAN.

(a)     Advances on the Apex Term Loan. On the Closing Date Lender shall advance the proceeds of the Apex Term Loan to Apex. Lender shall have no obligation to re-advance any sums repaid with respect to the Apex Term Loan.

(b)     Advances on the Mulungas Term Loan. On the Closing Date Lender shall advance the proceeds of the Mulungas Term Loan to Mulungas. Lender shall have no obligation to re-advance any sums repaid with respect to the Mulungas Term Loan.

(c)     <u>Advances on the Apex Line of Credit Loan.</u>

(1)     Lender agrees to make Advances on the Apex Line of Credit Loan to Apex from time to time from the date of this Loan Agreement to the Apex Line of Credit Maturity Date, provided that the aggregate amount of such Advances on the Apex Line of Credit Loan outstanding at any time does not exceed the lesser of the Apex Line of Credit Loan Amount or the Apex Borrowing Base. Within the foregoing limits, Apex may borrow, partially or wholly prepay, and re-borrow under this Loan Agreement subject to satisfaction all of conditions set forth herein. Advances shall be made at Lender's Address or at such other place as Lender may designate from time to time.

(2)     Advances from the Apex Line of Credit Loan may be requested orally or in writing by an Apex Authorized Person. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance from the Apex Line of Credit Loan shall be conclusively deemed to have been made at the request of and for the benefit of Apex (1) when credited to any deposit account of Apex maintained with Lender or (2) when advanced in accordance with the instruction of an Apex Authorized Person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding business day.

(3)     If at any time the aggregate principal amount of the outstanding Advances on the Apex Line of Credit Loan shall exceed the Apex Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances on the Apex Line of Credit Loan and the Apex Borrowing Base.

(4)     Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance of the Apex Line of Credit Loan, each repayment, and such other debits and credits as shall be appropriate in connection with the Apex Line of Credit Loan. Lender shall provide Apex with periodic statements of Apex's accounts, which statements shall be considered to be correct and conclusively binding on Borrower unless Apex notifies Lender to the contrary within thirty (30) days after Apex's receipt of any such statement which Apex deems to be incorrect.

(d)     <u>Advances on the MAG Line of Credit Loan.</u>

(1)     Lender agrees to make Advances on the MAG Line of Credit Loan to MAG from time to time from the date of this Loan Agreement to the MAG Line of Credit Maturity Date, provided that the aggregate amount of such Advances on the MAG Line of Credit Loan outstanding at any time does not exceed the lesser of the MAG Line of Credit Loan Amount or the MAG Borrowing Base. Within the foregoing limits, MAG may borrow, partially or wholly prepay, and re-borrow under this Loan Agreement subject to satisfaction all of conditions set forth herein. Advances shall be made at Lender's Address or at such other place as Lender may designate from time to time.

7C72093.DOC

(2)     Advances from the MAG Line of Credit Loan may be requested orally or in writing by a MAG Authorized Person.  Lender may, but need not, require that all oral requests be confirmed in writing.  Each Advance from the MAG Line of Credit Loan shall be conclusively deemed to have been made at the request of and for the benefit of MAG (1) when credited to any deposit account of MAG maintained with Lender or (2) when advanced in accordance with the instruction of an MAG Authorized Person.  Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding business day.

(3)     If at any time the aggregate principal amount of the outstanding Advances on the MAG Line of Credit Loan shall exceed the MAG Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances on the MAG Line of Credit Loan and the MAG Borrowing Base.

(4)     Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance of the MAG Line of Credit Loan, each repayment, and such other debits and credits as shall be appropriate in connection with the MAG Line of Credit Loan.  Lender shall provide MAG with periodic statements of MAG's accounts, which statements shall be considered to be correct and conclusively binding on Borrower unless MAG notifies Lender to the contrary within thirty (30) days after MAG's receipt of any such statement which MAG deems to be incorrect.

5.     ADVANCE REQUIREMENTS.  Notwithstanding any other provisions of this Loan Agreement seemingly to the contrary, Lender's obligation to make any Advance contemplated hereunder shall be subject to the following requirements, and Borrower represents and warrants that it will not request or accept an Advance until it has confirmed that the following requirements have been met:

(a)     the representations and warranties set forth in Section 6 and Section 7 hereof must be true and correct on and as of the date of such Advance with the same force and effect as if made on such date;

(b)     no Event of Default nor any event which, with notice or the lapse of time or both, would constitute an Event of Default, shall have occurred and be continuing;

(c)     no Lien, charge or encumbrance on, or any security interest in or other defect in the title to the Borrower's Collateral shall have been created, arisen, or otherwise have come into existence and continue to exist, except as expressly and affirmatively permitted hereby or by any other Loan Document; and

(d)     no default shall exist under the terms of the Security Agreement or the Mortgage.

6.     REPRESENTATIONS AND WARRANTIES.  Borrower hereby represents and warrants to Lender as follows:

7C72093.DOC

(a)     Authority.

(1)     Apex is a Missouri limited liability company, is in good standing in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents.

(2)     MAG is a Missouri limited liability company, is in good standing in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents.

(3)     Force is a Missouri limited liability company, is in good standing in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents.

(4)     Force Commercial is a Missouri limited liability company, is in good standing in the State of Missouri, has all requisite legal capacity to own, mortgage, develop, lease, sell and otherwise deal in and with real and personal property in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents.

(5)     Mid Western is a Missouri limited liability company, is in good standing in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents.

(6)     Mulungas is a Missouri limited liability company, is in good standing in the State of Missouri, has all requisite legal capacity to own, mortgage, develop, lease, sell and otherwise deal in and with real and personal property in the State of Missouri, and has all requisite legal capacity to execute, deliver, and perform its obligations as provided in the Loan Documents

(b)     No Conflict. The execution, delivery and performance by Borrower of the Loan Documents will not cause or constitute a violation of any law or regulation or any order, writ, injunction or decree of any court or Governmental Authority, or result in a breach of or constitute a default under, or result in the creation of any lien upon any property of Borrower pursuant to, any indenture or other agreement or instrument to which Borrower is a party or by which Borrower or Borrower's  properties may be bound or affected, or result in a breach of or constitute a default under Borrower's governing documents.

(c)     Binding Agreements.   This Loan Agreement and all other Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

(d)     Borrower Authorization.

7C72093.DOC

(1)     The execution, delivery and performance by Apex of the Loan Documents to which Apex is a party have been duly authorized by all necessary action on the part of Apex.

(2)     The execution, delivery and performance by of the Loan Documents to which MAG is a party have been duly authorized by all necessary action on the part of MAG.

(3)     The execution, delivery and performance by of the Loan Documents to which Force is a party have been duly authorized by all necessary action on the part of Force.

(4)     The execution, delivery and performance by of the Loan Documents to which Force Commercial is a party have been duly authorized by all necessary action on the part of Force Commercial.

(5)     The execution, delivery and performance by of the Loan Documents to which Mid Western is a party have been duly authorized by all necessary action on the part of Mid Western.

(6)     The execution, delivery and performance by of the Loan Documents to which Mulangus is a party have been duly authorized by all necessary action on the part of Mulungas.

(e)     <u>No Governmental Consent</u>.  No authorization, approval or consent by, or filing with, any Governmental Authority or public regulatory authority is necessary in connection with the authorization, execution, delivery and performance of any Loan Document by the Borrower.

(f)     <u>Litigation</u>.  There are no actions, suits or proceedings pending, or to the knowledge of Borrower threatened, against or affecting Borrower, any Member , any Guarantor, any of Borrower's Collateral, or any of Borrower's other real or personal property; or involving the validity or enforceability of the Note, or any other Loan Document or the priority of the liens, assignments and security interests thereof, at law or in equity, or before or by any Governmental Authority.

(g)     <u>Business Purpose of Loan</u>.  Borrower agrees that it will use the proceeds of the Note for business purposes (other than agricultural purposes) only, and not for consumer, personal, family, residential, or household purposes.  Borrower is borrowing the Loan on Borrower's own behalf, and not as nominee, designee, or agent for another, nor is Borrower acting for another in so borrowing the Loan.

(h)     <u>Business Permits.</u>  All governmental permits, licenses and approvals necessary for the Borrower to conduct its business operations have been obtained and are in full force and effect.

7C72093.DOC

(i)    No Current Default.  On the date hereof, there exists no Event of Default, nor any event, circumstance or situation which, with the giving of notice, the passage of time, or both, could become such an Event of Default.

(j)    Borrower Solvency.  On the date hereof, and after giving effect to the Loan from Lender to Borrower:

(1)    Neither of the Borrowers are insolvent as defined in the Bankruptcy Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code");

(2)    Each Borrower is able to pay its debts as they mature and become due and payable;

(3)    Each Borrower has capital sufficient to carry on its business;

(4)    the reasonable salable value of each Borrower's assets exceeds the aggregate amount of each Borrower's debts and liabilities, whether actual or contingent; and

(5)    the borrowing of the Loan from Lender as contemplated by the Loan Documents on or about the date hereof will not cause any Borrower to be insolvent.

(k)    No Bankruptcy.  Neither of the Borrowers contemplates filing a petition in bankruptcy or for an arrangement or reorganization under the Bankruptcy Code, nor are there any threatened or actual bankruptcy or insolvency proceedings against any Borrower.

(l)    Use of Proceeds.  The proceeds of the Loan will be used solely for those purposes stated in Section 3 hereof.

(m)    Withholding.  Section 1445 of the Tax Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform Lender that the withholding of tax will not be required in the event of any disposition of the Property pursuant to the foreclosure rights or powers of sale contained in the Security Agreement or in a subsequent deed of trust, the undersigned hereby certifies the following:

(1)    Borrower is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate, as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder;

(2)    Apex's employer identification number is [Redacted]9318, Force's employer identification number is [Redacted]7045, Force Commercial's employer identification number is [Redacted]1888, MAG's employer identification number is [Redacted]1777, Mid Western's employer identification number is [Redacted]9950, and Mulingas' employer identification number is [Redacted]8595; and

(3)    Borrower's address is correctly stated in the definition of Borrower's Address.

7C72093.DOC

It is understood that this Loan Agreement may be disclosed to the Internal Revenue Service and that any false statement contained in this Section 6(m) could be punished by fine, imprisonment, or both. Under penalties of perjury the undersigned person declares that he has examined the foregoing certification and to the best of his knowledge and belief it is true, correct and complete, and further declares that he has authority to sign this document on behalf of Borrower.

(n)     The Mortgaged Property. As to the Mortgaged Property:

(1)     The Force Commercial Mortgaged Property is owned by Force Commercial free and clear of all liens and encumbrances except for the Permitted Encumbrances.

(2)     The Mulungas Mortgaged Property is owned by Mulungas free and clear of all liens and encumbrances except for the Permitted Encumbrances.

(3)     The Mortgaged Property (and the present and intended use of the Mortgaged Property) complies with all applicable laws, ordinances, and regulations of all Governmental Authorities having jurisdiction over the Mortgaged Property, including without limitation all zoning ordinances and laws, and the Americans With Disabilities Act, 42 U.S.C. §12101, et seq., and all laws, ordinances and regulations affecting protected wetlands.

(4)     The Mortgaged Property constitutes one or more zoning lots separate and apart from all adjoining property, and is assessed separately from all other lands for tax purposes

(5)     All Occupancy Permits have been obtained and are in full force and effect.

(6)     The Mortgaged Property is serviced by all necessary utilities, including electricity, water, sewer, gas and telephone. All utility lines servicing the Mortgaged Property are either located in a public right-of-way adjacent to such Mortgaged Property or provided through public utility company rights-of-way (or those of a governmental or quasi-governmental authority or agency) or over private easements which are not subject to termination by foreclosure of any mortgages of record encumbering the property subject to such easements.

(7)     If access between any one of the Mortgaged Property and a public street is provided by an easement, the Borrower's easement rights therein are encumbered by one of the Mortgages, and such easement is not subject to being cut off by a foreclosure of any mortgages encumbering the property which is subject to it.

(8)     There are no: (i) liens or notices (including, without limitation, Federal or State tax liens, judgment liens, real estate broker liens, appraiser liens, and title

7C72093.DOC

examination liens) affecting the Mortgaged Property, except real estate taxes and assessments not yet due and payable; (ii) unpaid City, County, State, Federal or other governmental or association taxes or assessments of any kind on the Mortgaged Property; (iii) amounts owed to any real estate broker or sales person, real estate appraiser or title examiner with respect to the Mortgaged Property, nor any agreement, written or oral, which may be the basis for a broker's, appraiser's or title examiner's lien; or (iv) improvements to the Mortgaged Property (or property adjacent thereto) which may be the basis for a special assessment.

(9) There are no unpaid labor, mechanics or material claims against any of the Mortgaged Property.

(9) There are no violations of any covenants, conditions, restrictions or plat building lines affecting the Mortgaged Property.

(10) Except for lessees under the Leases, no one is in possession of any of the Mortgaged Property or has any possessory interest in any of the Mortgaged Property other than Borrower. No one other than Borrower has any interest, right or estate in the Mortgaged Property. No one other than Borrower has any right or option to purchase, sell or encumber any of the Mortgaged Property, including any right of first refusal with respect to the purchase of all or any part of the Mortgaged Property.

(o) **Employee Benefit Plans.** Each employee benefit plan under which Borrower may have any liability complies in all material respects with ERISA and all applicable requirements of law and regulation; and (1) no "reportable event" as described in Sections 4042(a) or 4043(b) of ERISA. has occurred with respect to any such plan; (2) Borrower has not withdrawn from any such plan or initiated steps to do so; (3) no steps have been taken to terminate any such plan or to appoint a trustee to administer such a plan; and (4) there are no "accumulated funding deficiencies" within the meaning of Section 302(a)(2) of ERISA or unfunded liabilities with respect to such plan other than those previously disclosed to Lender in writing.

(p) **Anti-Terrorism Law.** Neither Borrower nor any Member is (1) in violation of any laws relating to terrorism or money laundering including, without limitation, Executive Order No. 13224 on Terrorist Financing effective September 23, 2001, and the Currency and Foreign Transactions Reporting Act of 1970, each as amended from time to time (collectively, "Anti-Terrorism Laws"); (2) subject to any action, proceeding, investigation, charge, claim, or report alleging any violation of any of any Anti-Terrorism Law; (3) is a "prohibited person" as that term is defined in any Anti-Terrorism Law; or (4) named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official web site or any replacement website or other replacement official publication of such list.

(q) **Information Not Misleading, etc.** Independently of and in addition to the foregoing representations and warranties, Borrower hereby represents and warrants that neither the Loan Documents, any financial statement of Borrower, nor any statement, list, Borrowing

7C72093.DOC

Base Certificate, accounts receivable aging report, inventory listing, rent roll, certificate, or other information furnished or to be furnished on behalf of Borrower to Lender in connection with the Loan, including information furnished in connection with the application for the Loan, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Borrower has affirmatively disclosed to Lender all facts material to the Borrower's Collateral, and the Loan, including the operations of the Borrower's business and the financial condition and business prospects of Borrower, and Borrower represents that there has been no material adverse change to Borrower's or any Guarantor's financial condition since the date of the most recent submitted financial statement. Borrower agrees to provide to Lender financial statements and copies of such tax returns as set forth in Section 10 of this Loan Agreement, and other financial information and statements as may be requested by Lender. Borrower shall also furnish such other information regarding Borrower (and itsMembers), the Guarantors, Borrower's business operations, the Borrower's Collateral, and the use of Loan proceeds as may be requested by Lender. Borrower warrants that all financial statements, rent rolls, Borrowing Base Certificates, accounts receivable aging reports, and inventory listings will be prepared in a manner and form acceptable to Lender and the information provided to Lender therein is and will be accurate, correct and complete.

All representations and warranties made in this Section 6 shall survive the closing of the Loan.

## 7.     REPRESENTATION REGARDING THE ACCOUNTS, THE INVENTORY, AND THE EQUIPMENT.

(a)     Records. Each Borrower represents and warrants to Lender that it does now, and at all times hereafter shall, keep correct and accurate records of their respective Accounts, Equipment, and Inventory all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Apex Accounts, Apex agrees to keep and maintain such records as Lender may require, including without limitation information concerning Apex Eligible Accounts and Account balances and aging. With respect to the Inventory, each Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Apex Eligible Inventory, MAG's Eligible Box Truck and Step Van Inventory, and Mag's Eligible Kanban Inventory ( collectively the "Eligible Inventory') and records itemizing and describing the kind, type, quality, and quantity of the Eligible Inventory, Borrower's Eligible Inventory costs (or costs of production) and selling prices, and the daily withdrawals and additions to the Eligible Inventory. With respect to the Equipment, each Borrower agrees to keep and maintain such records as Lender may require. Records related to the Accounts, the Equipment, and the Inventory are and will be located at Borrower's Principal Place of Business.

(b)     Liens Borrower represents and warrants to Lender that as of the Closing Date, and at all times thereafter, the Accounts, the Inventory, and the Equipment are, and will be, owned by the respective Borrower in Borrower's own name, free and clear of all liens, encumbrances, pledges, assignments, and security interests, except those liens, security interests, and encumbrances created by the Loan Documents or agreed to by the Lender in writing.

7C72093.DOC

(c)  <u>Representations and Warranties Regarding Accounts.</u>  With regards to the Apex Accounts, Apex represents and warrants to Lender as of the Closing Date and at all times thereafter: (1) each Apex Account represented by Apex to be an Apex Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Apex Eligible Account; (2) all Apex Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time, with such frequency as Lender deems reasonable, and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Apex Account Debtors the accuracy of such Apex Account information.

(d)  <u>Representations and Warranties Regarding Inventory.</u>  With regards to the Inventory, each Borrower represents and warrants to Lender with respect to its own Inventory that as of the Closing Date and at all times thereafter: (1) all Inventory represented by Borrower to be Eligible Inventory for purposes of this Agreement conforms to the requirements of the definition of Eligible Inventory; (2) all Eligible Inventory values listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; (3) the value of the Eligible Inventory will be determined on a consistent accounting basis; (4) except as agreed to the contrary by Lender in writing, all Inventory is now and at all times hereafter will be in Borrower's physical possession and shall not be held by others on consignment, sale on approval, or sale or return; (5) except as reflected on the Inventory schedules delivered to Lender, all Eligible Inventory is now and at all times hereafter will be of good and merchantable quality, free from defects; (6) Eligible Inventory is not now and will not at any time hereafter be stored with a bailee, warehouseman, or similar party without Lender's prior written consent, and, in such event, Borrower will concurrently at the time of bailment cause any such bailee, warehouseman, or similar party to issue and deliver to Lender, in form acceptable to Lender, warehouse receipts in Lender name evidencing the storage of Inventory; and (7) Lender, its assigns, or agents shall have the right at any time, with such frequency as Lender deems reasonable, and at Borrower's expense to inspect and examine the Eligible Inventory and to check and test the same as to quality, quantity, value, and condition.

(e)  <u>Representations and Warranties Regarding Equipment.</u>  With regards to the Equipment, each Borrower represents and warrants to Lender with respect to its own Equipment that as of the Closing Date and at all times thereafter: (1) except as otherwise agreed to by Lender in writing, all Equipment is now and at all times hereafter will be located at Borrower's Principal Place of Business, (2) except as disclosed to Lender in writing, all Equipment is now and at all times hereafter will be of good and merchantable quality, free from defects; and (3) Lender, its assigns, or agents shall have the right at any time, with such frequency as Lender deems reasonable, and at Borrower's expense to inspect and examine the Equipment and to check and test the same as to quality, quantity, value, and condition.

All representations and warranties made in this Section 7 shall survive the closing of the Loan.

8.  <u>COVENANTS.</u>  Until payment in full of the Note and performance of all of Borrower's other obligations under the Loan Documents:

7C72093.DOC

(a)     <u>Notices</u>.  Borrower shall promptly give Lender notice of (1) any Event of Default or any event known to Borrower which, with notice or the lapse of time or both, would constitute an Event of Default, promptly after the same becomes known to Borrower, together with a written statement of the action being taken by Borrower to remedy the same, (2) all litigation or proceedings before any court or Governmental Authority affecting Borrower, any Member, any Guarantor, or any of the Borrower's Collateral.

(b)     <u>Legal Requirements</u>.  Borrower shall comply with all Legal Requirements applicable to the Borrower's Collateral, the operation of its business, if any, and other agreements or instruments to which it is a party or by which its properties or assets may be bound, a breach of which might materially and adversely affect its financial condition or operations or its ability to perform any of its other obligations under the Loan Documents.

(c)     <u>Liens</u>.  Borrower shall not create or suffer to exist any assignment, mortgage, pledge, security interest, conditional sale or other title retention agreement, lien, charge or encumbrance not created by one of the Loan Documents upon Borrower's Collateral except to the extent contested in compliance with Section 14(t) hereof.  All Accounts, Inventory, and Equipment shall be owned by one of the Borrowers and shall be owned by the respective Borrower in its own name.

(d)     <u>Sale or Disposition of Assets, etc.</u>  Borrower shall not sell, lease, transfer, abandon or otherwise dispose of all or any substantial portion of the Borrower's Collateral or any of its other properties or assets, whether now owned or hereafter acquired, other than in the ordinary course of its business.

(e)     <u>Equipment Liens</u>.  Except with Lender's prior written consent, Borrower shall not purchase any Equipment in any manner that will result in the ownership thereof not vesting unconditionally in Borrower, free from all liens, charges, encumbrances and security interests, including, but not limited to purchase money security interests.

(f)     <u>Business Entity</u>.  At all times until the Loan is repaid in full and Lender's obligation to make Advances hereunder is satisfied or discharged, each Borrower will not:

(1)     merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer, sell, lease or otherwise dispose of all or substantially all of its assets or change its legal structure without in each case Lender's written consent;

(2)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any Member or any other Borrower Affiliate, or any general partner, manager, member, shareholder, principal or affiliate thereof or any other person;

(3)     fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the State of Metals or

7C72093.DOC

(4) hold itself out to be responsible for the debts of another person or entity.

(g) <u>Application of Revenues</u>. Borrower shall apply all revenues earned from Borrower's operations to the payment of the operating expenses of the Mortgaged Property and next the sums currently due Lender on account of the Loan, before applying the same to any other purpose.

(h) <u>Use of the Mortgaged Property</u>. Without the express written consent of Lender, Borrower shall not use the Mortgage Property for any uses other than the Permitted Uses.

(i) <u>Minimum Debt Service Coverage Ratio.</u> Borrower shall maintain a consolidated Minimum Debt Service Coverage Ratio of not less than 1.20 to 1. This covenant will be measured quarterly on a trailing twelve month basis commencing with the quarter ending December 31, 2019. (Capitalized terms utilized in this Section 8(i) not otherwise defined in this Loan Agreement shall be defined in accordance with GAAP.)

<u>Debt Service Coverage Ratio</u> is defined as the ratio of (EBITDA– Taxes – Unfinanced Capex – Distributions) divided by (CPLTD + Capitalized Lease Payments + Interest Expense

<u>Capex</u> is defined as expenditures by the Borrowers on new and replacement property, plant and equipment.

<u>CPLTD</u> is defined as the schedule of principal payments on the Indebtedness during the following twelve months.

<u>Distributions</u> are defined as cash dividends or other distributions or payments on the membership interests or other equity interest of the Borrowers.

<u>EBITDA</u> is defined as the consolidated net income of Borrower for the twelve month period, before interest expense, income tax expense, depreciation and amortization and further adjusted to exclude any gain or loss on the sale of assets and other extraordinary gains or losses.

<u>Unfinanced</u> is defined as any expenditure of money during the twelve month period which is not financed with borrowed funds and is capitalized on a Borrower's balance sheet.

(j) <u>Compliance Reports.</u>

(1) If there is an outstanding principal balance on the Apex Line of Credit Loan as of the end of any month, Apex shall provide to Lender a Borrowing Base Certificate for said month accompanied by (i) Apex's's monthly accounts receivable aging report, and (ii) Apex's monthly raw and finished good inventory report containing

7C72093.DOC

a summary listing of all of Apex's Inventory.  All monthly reports shall be provided to Lender within 30 days following the end of each month and shall be accompanied by a certified statement signed by Apex that the monthly reports are true, accurate, and complete.

(2)     If there is an outstanding principal balance on the MAG Line of Credit Loan as of the end of any month, MAG shall provide to Lender a Borrowing Base Certificate for said month accompanied by (i) MAG's monthly listing of MAG Eligible Box Truck and Step Van Inventory, and (ii) MAG's monthly listing of MAG Eligible Kanban Inventory.  All monthly reports shall be provided to Lender within 30 days following the end of each month and shall be accompanied by a certified statement signed by Apex that the monthly reports are true, accurate, and complete.

(3)     Commencing December 31, 2019 and for each quarter thereafter, Borrower will provide to Lender a Minimum Debt Service Coverage Ratio compliance certification, such certification to be in such form and containing such information as may be requested by Lender.  All compliance certifications shall be provided to Lender within 30 days following the end of each quarter and shall be accompanied by a certified statement signed by Borrower that the compliance certification is true, accurate, and complete.

(k)     Rent Roll.  Commencing December 31, 2019 and annually thereafter, Mulungas shall provide Lender, not later than thirty (30) days after the end of each year end , a rent roll for the Mulungas Mortgaged Property accompanied by a certified statement of Mulungas that the rent roll is true, accurate and complete, which rent roll shall be in form and substance acceptable to Lender.

(l)     Leases.

(1)     Mulungas and Force Commercial  shall comply with all the requirements of the Leases to which they are a party and shall promptly give Lender notice of any default under the terms of the Leases together with a written statement of the action being taken by Mulungas or Force Commercial to remedy the default.

(2)     Without the prior written consent of Lender neither Mulungas nor Force Commercial shall not enter into a Lease with another Borrower or a Borrower Affiliate (an "Affiliate Lease").  Borrower shall provide Lender a copy of any proposed Affiliate Lease not less than 10 business days prior to the anticipated execution date of the Affiliate Lease.  Borrower shall provide to Lender a copy of all Affialiate Leases promptly following execution.

(m)     Lease Modifications.  During the continuance of an Event of Default, neither Mulungas nor Force Commercial shall not enter into, modify, amend, surrender, or terminate any Lease or reduce or abate any rent due under any Lease, nor shall Mulungas or Force Commercial consent to or otherwise permit any assignment, subletting or other transfer of any Lease by any lessee thereunder unless Mulungas or Force Commercial first obtains the prior

7C72093.DOC

written consent of Lender. Otherwise, Mulungas and Force Commerrcial shall be entitled to enter into, modify, amend, surrender, or terminate Leases and take such other action described above if such action is in the ordinary course of their business at competitive market rates and terms, and in the reasonably best interests of the property in their commercially reasonable judgment. If an Affiliate Lease is modified, Mulungas or Force Commercial shall promptly provide Lender a copy of the executed Lease modification.

(n)    Bank Accounts. Borrower shall maintain with Lender, until the Loan is fully repaid, the Primary Deposit Account and all its other bank accounts.

(o)    Restriction on Indebtedness. Without prior written consent of Lender, which Lender may give or withhold in its sole discretion, Borrower shall not incur any indebtedness, nor borrow money, except for the Loan, and indebtedness incurred to trade creditors in the ordinary course of Borrower's business; and Borrower shall not guarantee or become liable for the debts of any other Person.

(p)    Distributions to Members of Borrower. Borrower shall make no distributions to its Members if Borrower has not complied with the provisions of Sections 8(i), 8(g), and 8(i) hereof or if at the time of the proposed distribution an Event of Default exists or Borrower has knowledge of an event which, with notice or the lapse of time or both, would constitute an Event of Default.

(q)    Continuing Operations. Borrower shall not, without the express written approval of Lender, discontinue its business operations at any location at which it currently conducts its business

(r)    Employee Benefit Plans. Borrower will maintain each employee benefit plan under which Borrower may have any liability, in compliance with ERISA and any other applicable requirements of law and regulation.

(s)    Anti-Terrorism. The Borrower shall not (1) engage in any transaction blocked pursuant to any Anti-Terrorism Law; (2) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law; or (3) be or become subject at any time to any law, regulation or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower.

(t)    Appraisal, Fees and Expenses. In addition to any appraisals rights granted to Lender under the other Loan Documents, Owner agrees that Lender may obtain appraisals and reappraisals and perform property evaluations and appraisal reviews of the Mortgaged Property (i) when required by the regulations of the Federal Reserve Board or the Office of the Comptroller of the Currency, or any other regulatory agency, and (ii) at the reasonable discretion of Lender. Appraisals shall be performed by an independent third-party appraiser selected by Lender; property evaluations and appraisal reviews may be performed by third party appraisers

7C72093.DOC

or appraisers and staff of Lender.  The fees, expenses and other cost of such appraisals, reappraisals, property evaluations and appraisal reviews shall be paid by Borrower.  In addition, Borrower shall be responsible for payment of all fees and expenses of Lender and third parties relating to inspecting the Mortgage Property, environmental review, and monitoring the payment of the Impositions.  This authorization shall continue until the Loan is paid in full.

9.      CERTAIN MONTAGED PROPERTY-RELATED COVENANTS.

(a)      Impositions - Evidence of Payment.  Within thirty (30) days after the date when any Impositions which are or could become a lien on any part of the Mortgaged Property would become delinquent, Borrower will furnish to Lender official receipts of the appropriate Governmental Authorities to which the Impositions are payable, or other evidence reasonably satisfactory to Lender evidencing the payment thereof.  The certificate, advice or bill of the appropriate official designated by law to receive payment of any Imposition indicating non-payment of such Imposition shall be conclusive evidence (as between Lender and Borrower) that such Imposition is due and unpaid, and Lender may rely thereon.

(b)      Insurance Requirements.  Borrower shall maintain and keep in effect policies of hazard, liability, worker's compensation and such other insurance as set forth in the Mortgage and as Lender may require with respect to the Mortgaged Property, the other Borrower's Collateral and Borrower's business operations, in form, amounts, and coverages and with insurance companies acceptable to Lender.  The proceeds of said insurance shall be payable to Lender and shall be applied as provided in the Loan Documents. Borrower shall provide evidence of such insurance to Lender upon request by Lender, and annually without request by Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission, or default of Borrower or any other person.  In the event Borrower shall fail to maintain and keep in effect such policies Lender may, but shall not be required to, purchase, at Borrowers expense, such policies for the Borrower's Collateral.

(c)      Maintenance.  Until the Debt is paid in full, and the Loan Documents released and discharged, Borrower will keep the Mortgaged Property in good order and condition, and do all necessary Maintenance.  The standard for Maintenance required shall be that which is appropriate for facilities and buildings of similar construction and class, provided that Borrower shall in any event do all Maintenance necessary to avoid any structural damage or injury to the Improvements, to comply with all Legal Requirements and to keep each of the Improvements in a proper condition for their respective uses.  Borrower will not permit any condition to exist on any of the Mortgaged Property which would wholly or partially invalidate the insurance thereon.

(d)      Inspection by Lender.  With 24 hour prior notice to Borrower, Lender and Lender's representatives may enter the Mortgaged Property at reasonable times to inspect the same; provided, however, Lender shall have no obligation to make any such inspections nor any responsibility to Borrower, any of the Guarantors or any Person, for any problems which may be revealed by any such inspection, whether or not discovered by Lender.  If any Event of Default

7C72093.DOC

occurs, Lender may, at its option, enter the Mortgaged Property to protect, restore or do Maintenance on any part thereof. Lender shall not be liable for any such entry upon the Mortgaged Property. Lender shall use reasonable efforts to assure that such inspections and entry do not unreasonably interfere with any tenant's use of the Mortgaged Property.

(e)    Compliance Required. Borrower shall promptly comply with all present and future Legal Requirements, ordinary or extraordinary, foreseen or unforeseen, and all provisions of all instruments of record affecting any of the Mortgaged Property. Borrower will not make any application to any Governmental Authority for the creation of any special assessment or other district with the power to levy taxes or assessments on the Mortgaged Property, a change in zoning affecting any of the Mortgaged Property, nor will Borrower consent to any such change, without the prior written consent of Lender.

(f)    Conditions to Permitted Changes. Borrower shall have the right from time to time to make changes and alterations in or to the Improvements, at Borrower's expense, subject, however, to the condition that no structural change or alteration, or change which would impair the value of any of the Mortgaged Property shall be undertaken without the prior written consent of Lender.

(g)    Lender Not Liable; Indemnity. In no event shall Lender be responsible or liable in any way for any condition in or upon any of the Mortgaged Property (whether or not discovered by Lender), including any condition relating to the presence on the Mortgaged Property of any Hazardous Substance, or any defects in any of the Mortgaged Property or any personal injury, death, damage to property, loss, cost, liability, damage or expense in any way arising out of or connected with the condition or maintenance of any of the Mortgaged Property or any construction or other work thereon, or the use and occupancy of the Mortgaged Property, unless such conditions or defects are caused by Lender's gross negligence or willful misconduct. Borrower will indemnify, defend and hold Lender harmless from and against all such liability and responsibility, unless such conditions, defects, acts or omissions are caused by Lender's gross negligence or willful misconduct. The provisions of this Section 9(g) shall survive the payment of the Debt, performance of the Obligations and the release of the Mortgage.

10.    ACCOUNTING; FINANCIAL STATEMENTS.

(a)    Books and Records. Borrower will keep adequate records and books of account in accordance with Agreed Accounting Principles and will permit Lender, by its agents, accountants and attorneys, to (i) visit and inspect the Borrower's Collateral at Borrower's Principal Place of Business and at any other locations from which Borrower regularly conducts its business operations and examine, audit, and make copies or extracts from Borrower's books, accounts, records (including electronic records), and computer software programs used to generate the records, including any records in the possession of a third party, at any reasonable time upon request, and will provide to Lender copies of any records Lender requests, all at no cost to Lender; and (ii) discuss Borrower's affairs, finances and accounts with Borrower, its Members, managers agents and employees.

(b)    Annual Financial Statements.

7C72093.DOC

(1) Commencing for the 2019 calendar year and for each year thereafter, each Borrower shall provide to Lender on an annual basis its annual financial statements, reviewed by a certified public accountant approved by Lender and delivered to Lender not later than one hundred and twenty (120) days after and as of the end of each calendar year to include, but not limited to, a balance sheet, and an operating statement. If any Borrower has subsidiaries, financial statements for said Borrower shall be provided on a consolidated and consolidating basis. Such financial statements shall be prepared in accordance with Agreed Accounting Principles, showing such information as Lender may reasonably request, in form and detail satisfactory to Lender, and signed and dated by Borrower and by the certified public accountant reviewing such financial statements or otherwise authenticated to Lender's satisfaction.

(2) Commencing with the 2019 calendar year and for each year thereafter, Borrower shall cause each Guarantor to provide to Lender, not later than 120 days after and as of the end of each calendar year, financial statements and a schedule of debt of each such Guarantor prepared by in a manner and form acceptable to Lender and signed and dated.

(c)     For the quarter ending December 31, 2019 and for each quarter thereafter, Borrower shall furnish to Lender quarterly financial statements, including a balance sheet and an income statement or statement of profit and loss. If any Borrower has subsidiaries, financial statements shall be provided on a consolidated and consolidating basis. Such financial statement shall be prepared in accordance with Agreement Accounting Principles, showing such information as Lender may reasonably request, in form and detail satisfactory to Lender, and signed and dated by Borrower. Quarterly financial statements shall be delivered to Lender within 30 days of the end of the quarter.

(d)     Tax Returns.

(1) For the 2019 tax year and for each year thereafter, each Borrower shall deliver to Lender a true and complete copy of its federal income tax returns or any request for extension of time to file a federal return within thirty (30) days after such return or request for extension is filed.

(2) For the 2019 tax year and for each year thereafter, Borrower shall cause the Guarantors to deliver to Lender a true and complete copy of their federal income tax returns (including K-1s) or any request for extension of time to file a federal return within thirty (30) days after such return or request for extension is filed.

(e)     Other Information. Throughout the term of this Loan Agreement, Borrower and the Guarantors, with reasonable promptness, will deliver such other information with respect to Borrower, the Borrower's Collateral, and the Guarantor as Lender may reasonably request from time to time.

11.     EVENTS OF DEFAULT. An "Event of Default" shall exist if any one or more of the following events shall occur and be continuing:

7C72093.DOC

(a)     any sum of money coming due under the Apex Line of Credit Note, whether principal, interest, late charges, or otherwise, is not paid when due;

(b)     any sum of money coming due under the MAG Line of Credit Note, whether principal, interest, late charges, or otherwise, is not paid when due;

(c)     any sum of money coming due under the Apex Term Note, whether principal, interest, late charges, or otherwise, is not paid when due;

(d)     any sum of money coming due under the Mulungas Term Note, whether principal, interest, late charges, or otherwise, is not paid when due;

(e)     any sum of money coming due under this Loan Agreement or under any of the other Loan Documents (other than the Note) is not paid when due and such default continues for a period of five (5) days after written notice thereof from Lender to Borrower;

(f)     there shall at any time exist a default or an "Event of Default" under this Loan Agreement, the Security Agreement, the Mortgage, or any other Loan Document, other than payment default, and such default shall continue beyond any applicable period of notice and opportunity to cure under such Loan Documents, if any;

(g)     any representation or warranty made by or on behalf of Borrower or Guarantor, in this Loan Agreement or any other Loan Document or in any certificate, financial statement or other document furnished to Lender pursuant to the provisions hereof or of any other Loan Document, shall prove to have been false or misleading in any material respect when made or when deemed to have been made hereunder;

(h)     Borrower shall assign or attempt to assign this Loan Agreement or its right to receive any Loan proceeds hereunder;

(i)     the entry of any lien, security interests, or encumbrance against any of the Borrower's Collateral, except for those liens, security interests, or encumbrances approved in writing by Lender, subject to Borrower's right to contest Liens as provided in Section 14(t) hereof;

(j)     a default shall occur under any Lien upon any of the Borrower's Collateral, if the effect of such default is to cause, or (immediately or upon the giving of notice or passage of time, or both) to permit the holder or holders (or a trustee on behalf of such holder or holders) of the indebtedness secured by such Lien to cause, the indebtedness secured by such Lien to become due prior to its stated maturity or to cause any of the Borrower's Collateral to be subject to sale to foreclose or enforce such Lien;

(k)     the occurrence of any Transfer without Lender's written consent;

7C72093.DOC

(l)    insurance on any of the Borrower's Collateral is not provided or maintained, or evidence of such insurance is not delivered by Borrower to Lender, as required by Section 9(b) hereof;

(m)    Borrower's failure to maintain a Minimum Debt Service Coverage Ratio as set forth in Section 8(i) hereof;

(n)    any Guarantor shall die or become permanently disabled; provided, however, the death or disability of a Guarantor will not constitute a default hereunder if, within 60 days after such death or disability, a new guarantor acceptable to Lender in its sole discretion executes a guarantee in the same form as the Guaranty under which the new guarantor expressly acknowledges and agrees to assume, pay and perform all obligations of Borrower under the Loan Documents;

(o)    the legal existence of any Borrower shall terminate for any reason;

(p)    formal charges are filed, or any indictment is issued, by or on behalf of any Governmental Authority under any Forfeiture Law against Borrower or any Guarantor, or if proceedings are instituted under any Forfeiture Law for the forfeiture of any of the Borrower's Collateral;

(q)    the Mortgaged Property or any part thereof which Lender deems to be a material or significant part shall be condemned;

(r)    if any Borrower shall voluntarily cease or suspend transaction of its business; or if any Borrower or Guarantor shall (1) apply for or consent to the appointment of, or the taking of possession by, a receiver, assignee, custodian, trustee, liquidator or sequestrator (or other similar official) of Borrower or of all or a substantial part of the assets of Borrower or any Guarantor; (2) become insolvent or be generally unable, or admit in writing an inability, to pay its debts as they mature; (3) make a general assignment for the benefit of creditors; (4) commence a voluntary case under the Federal Bankruptcy Code (as now or hereafter in effect); (5) file a petition seeking to take advantage of any other law relating to the relief of debtors; (6) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under such Bankruptcy Code; or (7) take any company, corporate, limited liability company or partnership or other entity action for the purpose of effecting any of the foregoing

(s)    a proceeding or case shall be commenced in respect to any Borrower or Guarantor, seeking: (1) a decree or order for relief in any involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; (2) the liquidation, reorganization, dissolution, winding-up or composition or readjustment of debts of any of them; (3) the appointment of a trustee, receiver, custodian, liquidator or the like of any of them, or any substantial part of their assets; or (4) similar relief in respect of any of them under any law providing for the relief of debtors;

(t)    Borrower or any Guarantor (i) is in breach of or defaults under the terms

7C72093.DOC

of any note or agreement with Lender or any affiliate of Lender, or (ii) revokes or disputes the validity of any of its liabilities or obligations under the terms of any note or agreement with Lender or any affiliate of Lender;

(u)     a material adverse change occurs in any Borrower's financial condition;

(v)     Lender in good faith considers itself insecure; or

(w)     if Borrower shall default in the performance or observance of or compliance with any covenant, agreement, condition or provision contained in this Loan Agreement and not otherwise specified in this Section 11, or contained in any of the other Loan Documents and a default under which is not specifically defined as an "Event of Default" under such other Loan Document, and, unless otherwise provided for in this Loan Agreement or the Loan Documents regarding Borrower's right to cure, such default shall not be cured within twenty (20) days after notice thereof to Borrower; provided, that if such default is of such a nature that it can be cured but not by the mere payment of money, and not within such twenty (20) day period, then Borrower shall have such additional time as may be required to cure the same (but in no event extending more than sixty (60) days after such notice of default is given to Borrower), if Borrower commences to cure it within said twenty (20) day period (and gives notice to Lender of Borrower's intention to cure it), and prosecutes such cure with diligence and continuity to completion; provided however, nothing contained herein shall limited Lender's right to cure Borrower's defaults under the terms of any third party agreements within the cure periods set forth in said third party agreements.

12.     REMEDIES UPON AN EVENT OF DEFAULT.   Upon the occurrence of an Event of Default, in addition to any banker's lien rights, rights and remedies available to Lender under law, equity, the Note and/or any other Loan Document, Lender shall have the following rights and remedies:

(a)     Acceleration.  Upon the occurrence of an Automatic Acceleration Event of Default, then without notice or any other action by Lender, or upon the occurrence of any other Event of Default, then at the option of Lender, all the outstanding principal balance under the Note, together with all accrued interest and other sums due under the Note and Loan Documents, shall become and be immediately due and payable.

(b)     Cease Advances.   Upon the occurrence of any Event of Default, the obligation of Lender to make Advances of proceeds of the Loan hereunder shall automatically terminate and expire, without further act or deed by Lender.

(c)     Right to Set-off.   Upon and during the occurrence of any Event of Default, Lender may, and is hereby authorized by Borrower, at any time and from time to time, to the fullest extent permitted by applicable laws, without advance notice to Borrower (any such notice being expressly waived), set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and any other indebtedness at any time owing by Lender to, or for the credit or the account of, Borrower against any or all of the Obligations of Borrower now or hereafter existing, whether or not such Obligations have matured and

7C72093.DOC

irrespective of whether Lender has exercised any other rights that it has or may have with respect to such Obligations, including without limitation any acceleration rights. Lender agrees promptly to notify Borrower after any such set off and application, provided that the failure to give such notice shall not affect the validity of such set off and application. The rights of Lender under this Section 12(c) are in addition to the other rights and remedies (including, without limitation, other rights of set off) which Lender may have. In addition, if there is no Event of Default but Lender is served with a writ of garnishment seeking to attach any Borrower's funds held by Lender, Lender shall be entitled to set off as provided hereunder; but such garnishment shall not be deemed an Event of Default.  If Borrower discharges within 30 days of services of the writ of garnishment the obligation owed to the garnishor, Lender shall convey back to Borrower all funds set off due to the garnishment, less any fees or expenses incurred by Lender in processing the writ of garnishment.

(d)    Special Remedies.   Upon the happening of any Event of Default, following the expiration of any applicable cure period, Lender shall have the right, in addition to any other rights Lender may have under the Loan Documents, (i) enter upon and take possession of the Mortgaged Property and generally to do any and every act with respect to the occupancy, maintenance, and use of the Mortgaged Property as Borrower may do in its own behalf; (ii) enter upon Borrower's property and take possession of any of the Borrower's Collateral other than the Mortgaged Property except as prohibited by law, and Lender shall have and may exercise any and all rights of enforcement and remedies afforded to a lender under the Code; and (iii) exercise all rights and remedies otherwise provided and available to Lender at law or in equity as of the date of this Loan Agreement or the date of Borrower's default.

13.    MISCELLANEOUS.

(a)    No Broker.  Borrower represents that no broker was involved in procuring the Loan or in connection with the transactions contemplated hereby and shall indemnify and save Lender harmless from and against any and all claims for any brokerage commission arising out of the making of the Loan or the transactions contemplated hereby.  Borrower's obligations under this Section 13(a) shall survive the payment of the Note.

(b)    Origination Fee at Closing.  Borrower shall pay to Lender at or prior to Closing, as a non-refundable origination fee for Lender's agreement to make the Loan hereunder, the sum of Twelve Thousand Four Hundred Ninety-Two and 00/100 Dollars ($12,492.00).  Such fee has been fully earned by Lender and is neither refundable nor subject to reduction for prepayment of the Loan or any other reason.

(c)    Estoppel Certificate.  Borrower, within three (3) business days upon request in person or within seven (7) business days upon request by mail, will furnish a duly acknowledged written statement in form satisfactory to Lender setting forth the unpaid amount of the Loan (including principal, interest, and otherwise), and stating either that no offsets or defenses exist against the obligation to pay such unpaid amount of the Loan, or if such offsets or defenses are alleged to exist, the nature and extent thereof, and containing such other matters as Lender shall reasonably request.

7C72093.DOC

(d)     Payments, Etc.  All payments and prepayments of principal, interest and other amounts payable to Lender hereunder or under any other Loan Document shall be made in immediately available funds to Lender's office as specified in or pursuant to the Note, on the date on which such payment shall become due.  Borrower hereby irrevocably authorizes Lender to charge principal, interest or any other amounts payable by Borrower hereunder or under any other Loan Document, as and when the same become due and payable, directly against any general deposit account maintained by Borrower with Lender (up to the credit balance thereof), but Lender shall not be required to effect any such debit.  If Lender shall charge any Borrower account as aforesaid, Lender shall make reasonable efforts to give Borrower notice thereof within a reasonable time after such charge is made, provided however that Lender shall have no liability for failure to do so.  Borrower hereby assigns to Lender, and also grants to Lender a security interest under the Code in each such general deposit account as security for the payment of the Loan and all sums becoming due Lender under any of the Loan Documents, which security interest shall be in addition to and not in place of any right of set-off or banker's lien Lender may have.  Borrower represents and warrants to Lender that all sums from time to time deposited into any deposit account with Lender shall be the sole and absolute property of Borrower, and no other Person shall have any right, title or interest therein.  If any principal of or interest on the Loan or any other amount payable by Borrower hereunder falls due on a Saturday, Sunday or public holiday at the place of payment, then such due date shall be extended to the next succeeding full business day at such place and interest shall be payable in respect of each such extension of principal.

(e)     Lost Note.  If the Note shall be mutilated, destroyed, lost or stolen, Borrower will deliver to Lender in substitution therefor a new promissory note containing the same terms and conditions as the Note with a notation thereon of the unpaid principal and accrued but unpaid interest.  Borrower shall be furnished with reasonably satisfactory evidence of the mutilation, destruction, loss or theft of the Note.

14.     PROVISIONS APPLICABLE TO ALL LOAN DOCUMENTS.  The provisions of this Section 14 shall be applicable to this Loan Agreement, and, except as specifically set forth to the contrary in a Loan Document, shall also be applicable to and deemed incorporated into each of the Loan Documents which incorporate this Section 14 by reference. This Section 14 is not intended to make this Loan Agreement a replacement for the other Loan Documents, or to alter the express written agreement of the parties contained herein and in the other Loan Documents. Each of the other Loan Documents is incorporated herein by this reference.

(a)     Notices.  All notices, demands, requests and consents required under this Loan Agreement or any of the other Loan Documents, unless telephonic notice or notice by facsimile is expressly provided for,  shall be in writing, and shall be deemed properly given:  (a) if delivered personally;  (b) if sent by United States certified or registered mail with return receipt requested; (c) if sent by Federal Express or other nationally recognized overnight delivery service; or (d) if sent by facsimile transmission, confirmed by certified or Registered mail with return receipt requested; in each such case (except for personal delivery), with postage or charges prepaid or billed to sender, and addressed if to Borrower at Borrower's Address, if to the Lender, at Lender's Address, or at such other address or addresses as any party hereto may hereafter designate for itself by written notice to each other party to the Loan Documents.  Notices,

7C72093.DOC

demands and requests hereunder shall be deemed sufficiently served or given for all purposes hereunder on the earlier of the date of actual receipt, or:  (a) if served by certified or registered mail, three (3) days after the time such notice, demand or request shall be deposited for mailing in any Post Office or Branch Post Office regularly maintained by the United States Postal Service;  (b) if sent by overnight delivery service, on the day following delivery thereof to such overnight delivery service; or (c) if sent by facsimile transmission, with confirmation by certified or registered mail, on the date such facsimile transmission is sent if electronic confirmation of receipt is received by the sender.

(b)     Revival of Liability.  If any payments or proceeds received by Lender hereunder, or under any other Loan Document, are subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, to Borrower, directly or as a debtor-in-possession, to a receiver, or any other person, whether directly or indirectly, under any bankruptcy law, state or federal law, common law, or equitable cause, then Borrower's obligation to make all such payments shall be revived and shall continue in full force and effect as if such payment or proceeds had never been received by Lender.

(c)     Proceedings, Etc.    All proceedings taken in connection with the transactions provided for herein, including without limitation the appraisals and documents required or contemplated by this Loan Agreement or any of the Loan Documents, the persons responsible for the execution and preparation thereof, all  insurers and policies of insurance, all bonds and guaranties required hereby or by any of the Loan Documents, shall be satisfactory in form, scope and content and all other respects to Lender.

(d)     No Third Party Rights.  Nothing in this Loan Agreement or in any of the Loan Documents, whether express or implied, shall be construed to give to any person other than the parties hereto or the parties to the Loan Documents any legal or equitable right, remedy or claim under or in respect of this Loan Agreement or any other Loan Document, which is intended for the sole and exclusive benefit of the parties hereto.

(e)     Amendments.  No provision of this Loan Agreement or of any of the other Loan Documents shall be changed, altered, modified, waived, discharged, terminated or released, except by an instrument in writing signed by the party against whom enforcement of the change, alteration, modification, waiver, discharge, termination or release is sought.

(f)     No Waiver, Etc.  No failure on the part of Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right.  Without limiting the generality of the foregoing, no Advance hereunder shall constitute a waiver of any condition to the obligation of Lender to make further Advances.   The remedies provided herein and in any other Loan Documents shall be cumulative and not exclusive of any remedies provided by law, or of any other remedies provided herein or in any of the other Loan Documents.

(g)     Expenses.  Borrower shall promptly pay upon request all actual and reasonable costs and expenses incurred by Lender, including actual and reasonable attorney's

7C72093.DOC

fees, together with interest thereon at the Default Rate from the tenth (10th) day after demand by Lender for the payment thereof, in connection with:

(1)     all reasonable expenses of Lender in connection with the preparation, execution, delivery and negotiation of the Loan Documents, and any amendments and supplements to the Loan Documents at any time entered into, and in connection with the transactions contemplated by the Loan Documents or any amendments thereto, Lender's approval of any items submitted to Lender in connection with the Loan, Lender's approval of an Advance, and any consents or waivers or approvals hereunder or under any Loan Document (including the reasonable fees and expenses of Lender's counsel);

(2)     all charges, costs and expenses (to include fees paid to third parties) expended or incurred by Lender to monitor Lender's interest in the Borrower's Collateral, including without limitation all costs of appraisals;

(3)     all taxes, fees or other assessments, including stamp taxes, if any, upon any documents or transactions contemplated hereby or in connection with the recording and filing of any Loan Documents;

(4)     any further assurances (including instruments, documents, certifications, and other) requested by Lender under any provision of any of the Loan Documents, including all filing and recording costs and costs of searches;

(5)     all costs of collection (including to the extent not prohibited by law, reasonable attorney's fees) if default is made in the payment of the Loan or any other sums payable to Lender under the Loan Documents or if any Event of Default shall occur;

(6)     any action, proceeding, litigation or claim instituted or asserted by or against Lender, or in which Lender becomes engaged, wherein it becomes necessary in the opinion of Lender to protect Lender's interests in the Borrower's Collateral or the security afforded by any of the Loan Documents, or the validity or effectiveness of any assignment of any claims, awards, payments, insurance policies or any other right or property conveyed, encumbered or assigned by Borrower to Lender under any of the Loan Documents, or the priority of any of the same;

(7)     the collection and/or enforcement of any of the Debt and/or Obligations, including realization upon any of the Borrower's Collateral or other security for any of the Debt or Obligations; and

(8)     the collection and application of any insurance proceeds and Condemnation Awards.

All of Borrower's obligations under this Section 14(g) shall survive the payment of the Note and the termination of this Loan Agreement. All such expenses and costs, with interest

7C72093.DOC

thereon at the Default Rate, shall be added to and become part of the indebtedness and shall be secured by each of the Loan Documents.

Borrower shall also be responsible for payment of all third party expenses related to the Loan. Such third party expenses shall include, but not be limited to, cost of appraisals, Lender's cost and expenses associated with Lender's approval of Advances, third party review and monitoring of the Accounts, the Inventory and the Equipment whether done at Borrower's or Lender's request, all recording and closing fees, and all legal fees and costs incurred by Lender on the Loan.

(h)     Interest Limitation.  All agreements between Borrower and Lender are expressly limited so that in no contingency or event whatsoever whether by reason of advancement of the principal amount of the Note, acceleration of maturity of the unpaid principal balance thereof, or otherwise, or advancement of any sums under the provisions of the Loan Documents, or otherwise, shall the amount paid or agreed to be paid to the holder of the Note for the use, forbearance or detention of the money to be advanced thereunder or hereunder exceed the highest lawful rate permissible.  If, from any circumstances whatsoever, fulfillment of any provisions of the Note or any other Loan Document, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable thereto or hereto, then, ipso facto, the obligations to be fulfilled shall be reduced to the limit of such validity, and if from any circumstance, the holder of the Note or Lender shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.  This provision shall control every other provision of all agreements between Borrower and Lender; provided, however, that there shall be no automatic reduction of such payments as to any party hereto barred by law from availing itself in any action or proceeding of the defense of usury, or any party barred or exempted from the operation of any law limiting the amount of interest that may be paid for loan or use of money, or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of the statute or statutes limiting the amount of interest that may be paid for the loan or use of money.

(i)     Application of Moneys.  Whenever in the Note, this Loan Agreement, or any of the other Loan Documents Lender is to apply, or shall elect to apply, any sum of money to payment of any of the Debt, or to performance of any of the Obligations, Lender may so apply such sums to principal, interest, costs and expenses, or otherwise, all in such order of priority as Lender may elect, unless a different order of priority is required by non-waivable applicable law.

(j)     Governing Law.  This Loan Agreement shall be construed in accordance with and governed by the internal laws (without regard to any conflicts of laws rules which might otherwise require reference to the laws of any other state) of the State of Missouri.

(k)     Venue.  Venue for any action arising pursuant to or to enforce any provision of this Loan Agreement shall be exclusively found in the Circuit Court of Jackson County, Missouri.  Borrower hereby submits to the jurisdiction of the Circuit Court of Jackson County, Missouri.

7C72093.DOC

(l)     Successors and Assigns. Each of the Loan Documents, including this Loan Agreement, shall be binding upon and inure to the benefit of the parties to such Loan Document and their respective heirs, personal representatives and successors, any assigns of Lender, and any assigns of Borrower permitted under the Loan Documents.

(m)     Multiple Counterparts, Facsimile. Each of the Loan Documents, including this Loan Agreement, may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which when taken together shall constitute a single counterpart instrument. Executed signature pages to any counterpart instrument may be detached and affixed to a single counterpart, which single counterpart with multiple executed signature pages affixed thereto constitutes the original counterpart instrument. All of these counterpart pages shall be read as though one and they shall have the same force and effect as if all of the parties had executed a single signature page. An electronic transmission or other facsimile of any Loan Document, other than the Note, or any related document which Lender in good faith believes has been signed by Borrower and has been delivered to Lender by a properly authorized representative of the Borrower, whether or not that is in fact the case, shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

(n)     Provisions Severable. If any provision of the Loan Documents, including this Loan Agreement, or application thereof to any person or circumstances shall, to any extent, or for any reason, be held invalid or unenforceable, the remainder of such Loan Document or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of the Loan Document shall be valid and be enforced to the fullest extent permitted by law.

(o)     Lender Approvals and Consents. Except as otherwise expressly stated in any of the Loan Documents, with respect to any matters which Lender shall have the right to approve, consent to, be satisfied with respect to, exercise its judgment with regard to determine or calculate, under any of the Loan Documents, including this Loan Agreement, the decisions of Lender with respect to such matters shall be made in the sole discretion of Lender, may be given or withheld without regard to reasonableness, and shall be final and conclusive. Any consent or approval which Lender may choose to give may be given subject to such conditions as Lender may require.

(p)     Time of Essence. Time is of the essence with respect to all obligations of Borrower under this Loan Agreement and under any of the Loan Documents.

(q)     Other Interpretive Provisions. As used herein, and as used in each of the other Loan Documents, the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean "provisions, terms, covenants and/or conditions"; (iii) "any of the Borrower's Collateral" shall mean "the Borrower's Collateral or any part thereof or interest therein"; and (iv) "any of" shall mean all or any part of or interest in that with respect to which such phrase is used. The headings and captions in this Loan Agreement and in the other Loan Documents are for convenience only, and are not to be construed as defining or limiting in any way the scope or intent of the provisions of this Loan Agreement or such other Loan Documents. Each of the parties have participated in the

7C72093.DOC

negotiation and preparation of this Loan Agreement and the other Loan Documents, with the advice of counsel, and this Loan Agreement and the other Loan Documents shall not be construed against any party by reason of that party having prepared the initial draft, or subsequent versions, of this Loan Agreement or such other Loan Documents.

(r)     Intentionally Deleted.

(s)     Miscellaneous Provisions.   Whenever used in this Loan Agreement or in any of the other Loan Documents, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders. If any provision of this Loan Agreement or of any of the other Loan Documents shall conflict with any provision of any other Loan Document, the provision of the document which shall enlarge the interest of the Lender in the Borrower's Collateral, afford the Lender greater financial security in the Borrower's Collateral and/or tend to assure payment of the Debt and performance of the Obligations in full, shall control.  The granting of consent by Lender to any matter as to which such consent is required by the provisions of this Loan Agreement or of any of the other Loan Documents shall not be deemed a waiver of the right to require consent to future or successive matters.  If Borrower is ever more than one person (or entity), the obligations of Borrower hereunder and under the other Loan Documents are joint and several.

(t)     Right to Contest.  After prior written notice to Lender, Borrower may contest, in good faith and by appropriate legal proceedings timely commenced and diligently prosecuted with continuity to completion, the validity and applicability of any Legal Requirement, and the validity or amount of any Imposition or mechanic's or materialmen's Lien, provided that:

(1)     No Event of Default, nor any event or circumstance which, with the giving of notice or passage of time or both would constitute an Event of Default shall exist;

(2)     Borrower or such owner shall provide to Lender such cash or other security assuring compliance with the Legal Requirement or the payment of the Imposition or Lien contested, with interest and penalties, if any, in amounts satisfactory to Lender, as Lender may request;

(3)     Such contest operates as a stay of or prevents enforcement of any contested Legal Requirement, Imposition or Lien (or any judgment based thereon) against the Borrower's Collateral;

(4)     Borrower shall pay all fees and expenses of Lender reasonably incurred in connection with any such contest or proceeding, including without limitation reasonable attorney's fees and expenses;

(5)     Such contest operates to prevent any interruption of use or enjoyment of the Borrower's Collateral as a result of the contested Legal Requirement, Imposition or Lien not being complied with or paid;

7C72093.DOC

(6)     Lender shall have the right to pay or require payment of any such Imposition or Lien and to require compliance with such Legal Requirement at any time when Lender reasonably believes that continuation of such contest or failure to comply with such Legal Requirement or pay such Imposition or Lien could jeopardize or impair the value or safety of Lender's security; and any amount so paid by Lender shall be added to the Debt except to the extent paid from the security deposited under this Section 14(t) shall bear interest at the Default Rate until paid, and shall be secured by the Security Agreement; and

(7)     If such contest is terminated adversely to the Borrower or discontinued, Borrower shall immediately comply with such Legal Requirement or pay such Imposition or Lien.

(u)     Consent to Sell Loan.  Borrower agrees that Lender may sell or offer to sell the Loan or interests therein to one or more assignees or participants.  Borrower shall execute, acknowledge and deliver any and all instruments reasonably requested by Lender in connection therewith, and to the extent, if any, specified in any such assignment or participation, such assignee(s) or participant(s) shall have the same rights and benefits with respect to the Loan Documents as such Person(s) would have if such Person(s) were Lender hereunder.  Lender may disseminate any information it now has or hereafter obtains pertaining to the Loan, including any security for the Loan, any credit or other information on the Mortgaged Property (including environmental reports and assessments), Borrower, any Member, or any Guarantor, to any actual or prospective assignee or participant, to Lender's Affiliates, to any regulatory body having jurisdiction over Lender or to any other party as necessary or appropriate in Lender's reasonable judgment.   Borrower waives any rights to privacy it may have with respect to such disseminations of information.

(v)     Electronic Transmission.  Lender and Borrower agree certain Loan-related data (including confidential information, documents, applications and reports) may be transmitted electronically, including over the Internet.  This data may be transmitted to, received from or circulated among agents and representatives of Borrower and/or Lender and their affiliates; and other persons involved with the subject matter of this Loan Agreement.  Borrower acknowledges and agrees that (a) there are risks associated with the use of electronic transmission and that Lender does not control the method of transmittal or service providers, (b) Lender has no obligation or responsibility whatsoever and assumes no duty or obligation for the security, receipt, or third party interception of such transmissions, and (c) Borrower will release, hold harmless and indemnify Lender from any claim, damage or loss, including those arising in whole or part from Lender's strict liability, or sole, comparative or contributory negligence, which are related to the electronic transmittal of data.

(w)     U.S.A. Patriot Act.  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), Lender is required to obtain, verify and record information that identifies Borrower and its affiliated entities, if any, which information includes the name and address of Borrower and its affiliated entities, if any, and other information that will allow

7C72093.DOC

Lender to identify Borrower and its affiliated entities in accordance with the Patriot Act. Borrower hereby agrees to provide such information promptly upon request by Lender. In connection therewith, Borrower shall: (1) ensure that no person who owns a controlling interest in or otherwise controls Borrower or any affiliated entity is or shall be listed on the "Specially Designated Nationals and Blocked Person List" or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury, or included in any Executive Orders; (2) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto; and (3) comply, and cause each affiliated entity to comply, with all applicable Bank Secrecy Act laws and regulations, as amended.

        (x)    Execution of Documents, Consultation with Counsel.    Borrower acknowledges and agrees that it has had an opportunity to review and consider the terms and provisions of this Loan Agreement and each Loan Document, to consult with counsel of its choice, if desired, and to suggest changes to the structure and terms of this Loan Agreement and the other Loan Documents. Borrower warrants and agrees that its execution of this Loan Agreement and the other Loan Documents is made voluntarily and with full knowledge of the significance and effect of the Loan Agreement, the Note, and the other Loan Documents.

        15.    Statutory Notice. **NOTICE:   The following provision is included in compliance with Missouri Revised Statutes Section 432.047: ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE NOTE OR THIS LOAN AGREEMENT. TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENT REACHED BETWEEN BORROWER AND LENDER ARE CONTAINED IN THIS AGREEMENT, AND THE LOAN DOCUMENTS WHICH ARE THE COMPLETE AND EXCLUSIVE STATEMENTS OF THE AGREEMENT BETWEEN BORROWER AND LENDER, EXCEPT AS MAY BE LATER AGREED TO IN WRITING.**

        16.    Waiver of Trial by Jury. **BORROWER WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH BORROWER AND LENDER MAY BE PARTIES, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO, THIS LOAN AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTION OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS LOAN AGREEMENT, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWER, AND BORROWER HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF**

7C72093.DOC

**TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS LOAN AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. BORROWER AGREES AND CONSENTS THAT LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS DOCUMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.**

[Signature page to follow]

7C72093.DOC

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Loan Agreement as of the day and year written below.

**"BORROWER"**

**MULUNGAS, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Sole Member


**FORCE MIDWEST, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Manager


**APEX SPECIALTY VEHICLES, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Manager


**MAG TRUCKS, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Manager


**MID WESTERN AUTOMOTIVE, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Sole Member


**FORCE COMMERCIAL BUILDING, LLC,** a Missouri
limited liability company

By: _____          Date: ___12/2/19___
Brad Carlson, Manager


6S53058.DOC

**"LENDER"**

**ENTERPRISE BANK & TRUST**

By: _____                         Date: __12/2/19__
      Aaron Wiens, Vice President

6S53058.DOC